[No. H028539. Sixth Dist. June 22, 2006.]

GILROY CITIZENS FOR RESPONSIBLE PLANNING et al., Plaintiffs and
Appellants, v.
CITY OF GILROY, Defendant and Respondent;
WAL-MART STORES, INC., et al., Real Parties in Interest and
Respondents.

912

914

**COUNSEL**

Law Offices of William D. Kopper and William D. Kopper for Plaintiffs and Appellants.

Berliner Cohen, Andrew L. Faber, Linda A. Callon and Thomas P. Murphy for Defendant and Respondent.

Steefel, Levitt & Weiss, Arthur J. Friedman, Judy V. Davidoff and Shirley E. Jackson for Real Parties in Interest and Respondents.

## OPINION

**PREMO, Acting P. J.**—Plaintiffs Gilroy Citizens for Responsible Planning, Steve Jones, Carmen Soto, and Lenny Ortega (hereafter, collectively, Citizens),[1] opposed to the construction of a Wal-Mart Supercenter (Supercenter) in the Pacheco Pass Shopping Center in Gilroy, appeal the denial of their petition for a writ of mandate to set aside defendant City of Gilroy (City)'s certification of an environmental impact report (EIR) and approval of the Supercenter. They assert that City violated the California Environmental Quality Act (CEQA)[2] by failing to comply with procedural requirements and by failing to include a study of certain adverse impacts and mitigation measures in the final EIR.

## FACTS

In 2002, real party in interest Newman Development Group of Gilroy (Newman) proposed building a 219,622 square foot Supercenter in the Gilroy Highway 152 Retail Center. The retail center would be a large-scale retail and business/industrial park located in the western portion of the Rincon Plaza Project. This planned high-intensity or regional-type shopping center was in the then 10-year-old 174-acre Rincon Plaza annexation area east of Highway 101 and north of Highway 152 (Pacheco Pass Highway).[3] The Supercenter's 20-acre parcel was already zoned "C3-M2/PUD" (shopping center commercial—general industrial/planned unit development) in accordance with the 2002–2020 general plan.

Economic and traffic studies and an EIR on the impacts of large-scale retail uses were prepared before the 1993 annexation and an additional traffic report

---

[1] Gilroy Citizens for Responsible Planning is a "grass roots citizens group" and a "not for profit public benefit association" whose members live, work, travel through, and "enjoy the amenities" provided by Gilroy and who are concerned with Gilroy's economic vitality, the protection of the environment, the education of the public and governmental decision makers, and the enhancement of "the democratic self-government process." Carmen Soto is an employee of Nob Hill Foods and Lenny Ortega is a member of the United Food and Commercial Workers Union Local 428 and a meat cutter for Albertsons Market. Real parties in interest are Wal-Mart Stores, Inc., and Newman Development Group, LLC.

[2] Public Resources Code sections 21000 through 21178. Further statutory references are to this code unless otherwise stated.

[3] A drainage channel, known as Ronan Channel, borders the project site on the north. North of the Ronan Channel is Gilman Road, which becomes Sixth Street within Gilroy city limits, and agricultural land. To the east of the project site is agricultural land that is in the annexation area. South of the project site is Highway 152, a major connector between the San Francisco Bay Area and the Central Valley and Interstate 5.

and an initial study for the Gilroy Highway 152 Retail Center were prepared in 2001.[4]

The proposed Supercenter and its traffic impacts were controversial, so when Newman filed the Supercenter application for architectural and site review, City required an EIR addressing (1) agricultural resources (since prime agricultural land would be converted to urban use, although that issue had been addressed in the three earlier studies); (2) air quality; (3) transportation and traffic; and (4) other environmental effects. Notice of a public scoping meeting[5] was mailed to public agencies, residents, and groups who had expressed interest in the project. The notice advised there had been prior environmental review in 1993 in the Rincon Plaza EIR and in 2001 in the Gilroy Highway 152 Retail Center initial study (see fn. 3, *ante*), and that after the initial study, City adopted the Gilroy Highway 152 Retail Center mitigated negative declaration in accordance with CEQA. After public input, City and EMC prepared a draft EIR over the next several months.

As expected, the draft and final EIR's generated considerable public interest. Nevertheless, the planning commission recommended certification of the EIR and approval of the Supercenter project. The city council considered the Supercenter at three public meetings and certified the EIR and approved the project with 47 final conditions of approval and 18 mitigation measures.

Plaintiffs filed this action on May 4, 2004, to overturn certification of the EIR and approval of the project. After a hearing on November 12, 2004, the trial court denied the petition. It found that City "did not engage in any prejudicial abuse of discretion," that it "proceeded in a manner required by law," and that "its determination or decision is supported by substantial evidence." This appeal ensued.

## ISSUES ON APPEAL

Citizens contend City (1) failed to provide the legally required 45-day notice of availability (NOA) of the draft EIR; (2) did not serve the commenting agencies with either responses to comments or the final EIR; (3) failed to

---

[4] Spectrum Economics, Inc., produced the June 12, 1992 "Economic Impacts of the Proposed Rincon Plaza Project" (the Spectrum report). Higgins Associates prepared the "Rincon Plaza Traffic Analysis Report" dated September 1992. The EIR for the project, the "Rincon Plaza Annexation and General Plan Amendment Final Environmental Impact Report" (Rincon Plaza EIR) dated March 1993, was prepared by the EMC Planning Group, Inc. (EMC). In 2001, Higgins prepared an additional traffic study and EMC prepared the Gilroy Highway 152 Retail Center initial study.

[5] "Scoping" is the lead agency's early consultation before completion of a draft EIR with any person or organization the lead agency believes will be concerned with the environmental effects of the project. (CEQA Guidelines, Cal. Code Regs., tit. 14, § 15083 (Guidelines).)

complete an initial study which was necessary before it could rely on the Spectrum report on economic impacts; and (4) did not follow CEQA's required procedures in determining whether urban decay impacts should be addressed in the EIR. In addition, the EIR (5) excluded an analysis of the Supercenter's blight and urban decay impacts; (6) failed to provide meaningful consideration of proposed mitigation measures; and (7) failed to properly analyze Sixth Street traffic impacts.

## STANDARD OF REVIEW

In reviewing an agency's decision for compliance with CEQA, the scope and standard of the appellate court's review is the same as the trial court's. (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713 [32 Cal.Rptr.2d 704].) The court reviews the administrative record to determine whether the agency prejudicially abused its discretion. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1132–1133 [26 Cal.Rptr.2d 231, 864 P.2d 502].) "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5; see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392, fn. 5 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*).) For CEQA, "substantial evidence" is "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made . . . is to be determined by examining the whole record before the lead agency. Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate . . . does not constitute substantial evidence." (Guidelines, § 15384, subd. (a).) Factual testimony of agency staff based on personal knowledge is substantial evidence. (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1380 [43 Cal.Rptr.2d 170].)

The agency is the finder of fact and a court must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) " 'Technical perfection is not required; the courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure.' " (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 836 [29 Cal.Rptr.2d 492] (*Concerned Citizens*).) "A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or

could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so." (*Laurel Heights I, supra,* 47 Cal.3d at p. 393.) "[T]he relevant inquiry here is not whether the record establishes compliance but whether the record contains evidence [the agency] *failed* to comply with the requirements of its . . . regulatory program. In the absence of contrary evidence, we presume regular performance of official duty. (Evid. Code, § 664.)" (*City of Sacramento v. State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 976 [3 Cal.Rptr.2d 643], original italics.) The project opponents bear the burden of proving that the EIR is legally inadequate. (*Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 740 [22 Cal.Rptr.2d 618] (*Al Larson*); § 21168.5; Guidelines, § 15151.)

## FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

Respondent City states, "as a threshold matter, Appellants' challenges [to certification of the EIR] are precluded because, by not raising their contentions during the environmental review process in which they actively participated," appellants failed to exhaust their administrative remedies. City accuses Citizens of failing to claim during the administrative proceedings that there was no proof in the record that City "(1) provided the public with Notice of Availability of the Draft EIR for the length of time required by CEQA, (2) provided the public with Notice of Availability of the Draft EIR in the manner required by CEQA, and (3) served commenting agencies with responses to comments." In addition Wal-Mart contends Citizens failed to raise at the administrative level the complaint that the EIR did not give notice that it tiered from the Rincon Plaza EIR.

■ Citizens counter with section 21177, subdivision (e). It provides an exception to section 21177's preclusion of a court challenge to an approval of a project unless the objector presented his or her grounds for noncompliance to the public agency during the public comment period. Subdivision (e) states that section 21177 "does not apply to any alleged grounds for noncompliance with this division for which there was no public hearing or other opportunity for members of the public to raise those objections orally or in writing prior to the approval of the project, or if the public agency failed to give the notice required by law." Citizens rely on the latter ground, claiming that City failed to comply with section 21092, subdivision (b)(3), in that its proof of mailing and publication were defective; City failed to comply with section 21092.5 by failing to provide commenting public agencies with notice of proposed responses to their comments prior to certification of the final EIR; and the EIR failed to notify the public that it tiered from the Rincon Plaza EIR, in violation of Guidelines section 15152, subdivision (g).

On the latter point, we disagree. Citizens characterize the purported "failure [of the Wal-Mart EIR] to notify the public it tiered from the Rincon Plaza EIR" as a "notice error" in order to "excuse[] the requirement of exhaustion of administrative remedies requirement with respect to all issues related to tiering." However, the draft Wal-Mart EIR identified the Rincon Plaza EIR and several studies antecedent to it as connected to its preparation. Citizens did not object to the adequacy of disclosure during the administrative proceedings when any error could easily have been corrected. Citizens have not exhausted their administrative remedies on this point.

■ "Where a petitioner has not exhausted its administrative remedies a trial court has no jurisdiction to decide the dispute. [Citation.] The purpose of the rule of exhaustion of administrative remedies is to provide an administrative agency with the opportunity to decide matters in its area of expertise prior to judicial review." (*Browning-Ferris Industries v. City Council* (1986) 181 Cal.App.3d 852, 859 [226 Cal.Rptr. 575].)

However, based on section 21177, subdivision (e), the trial court had jurisdiction to proceed on other issues in this case. The failure of the EIR to analyze air pollution, urban decay, and traffic were raised in the administrative proceedings prior to approval of the EIR. (See *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1118–1119 [71 Cal.Rptr.2d 1].) John Gabrielli, Citizens' attorney, stated at the February 14, 2004 city council meeting that he and his associate, Attorney William Kopper, sent letters and provided economic reports and other information which provided "substantial evidence that the project may cause or contribute to potentially significant impacts that may lead to blight-like conditions, which is what CEQA requires further study of." Gabrielli stated that "under CEQA, this project cannot be approved without further study of those impacts without identifying and if feasible adopting mitigation measures that are available." Gabrielli sent a letter three days later listing economic impacts, traffic, and air quality as subjects of concern. In addition, other objectors raised these issues, both verbally and in writing. A party challenging an approved project under CEQA may litigate issues that were timely raised by others as long as the challenging party objected to project approval on any ground during the public comment period or prior to the close of the public hearing on the project. (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1199–1200 [22 Cal.Rptr.3d 203] (*Bakersfield Citizens*).) Citizens have exhausted their administrative remedies on the notice issues.

## NOTICE

Citizens assert that this court should set aside certification of the Super-center EIR because City (1) failed to provide the legally required 45-day NOA of the draft EIR[6] and (2) did not serve the commenting agencies with responses to their comments prior to certification of the final EIR in violation of section 21092.5.

 Notice "shall be given to the last known name and address of all organizations and individuals who have previously requested notice and shall also be given by at least one of the following procedures": publication at least once (Gov. Code, § 6061) in a newspaper of general circulation in the area affected by the project; posting on- or off-site in the area where the project is to be located; or direct mailing to the owners and occupants of contiguous property shown on the latest equalized assessment roll. (§ 21092, subd. (b)(3).) In addition, notice shall be posted in the office of the county clerk for 30 days. (§ 21092.3; Guidelines, § 15087, subd. (d).)

City claims it supplied notice of the draft EIR "at least three ways, rather than the required two." City states it gave notice by publication in the Gilroy Dispatch, by direct mailing to owners of contiguous properties, and by direct mailing to agencies, groups, and individuals who had expressed interest. Notice was also posted by the Santa Clara county clerk for 30 days. Nevertheless, Citizens complain there is no evidence in the record that either publication or mailing were properly conducted.

1. Publication. The record contains a certificate by the printer and principal clerk of the Gilroy Dispatch that the NOA of the EIR was published on December 11, 2003. Citizens complain this notice was defective because it provided only 42 days' notice prior to the close of the comment period on the draft EIR on January 22, 2004, rather than the required 45 days. Citing section 21092, subdivision (a), City responds that "42 days prior to the close of the public review period is notice given a 'reasonable period of time prior to certification of the environmental impact report' on April 5, 2004, as required by CEQA."

Section 21092, subdivision (a), does not apply. City confuses section 21092, subdivision (a), which sets out time periods for reviews of *final* EIR's and allows substantial compliance with notice of *contents* requirements, with section 21091, subdivision (a). Section 21091, subdivision (a) governs time

---

[6] When the EIR is submitted to the State Clearinghouse Office of Planning and Research (OPR), as this EIR was, the review period is 45 days. (§ 21091, subd. (a); Guidelines, § 15205, subd. (d).) The lead agency must provide public notice of a draft EIR at the same time as it sends a notice of completion to the OPR. (Guidelines, § 15087, subd. (a).)

periods for review of *draft* EIR's. That section and Guidelines section 15205 require a 45-day public review period for a draft EIR submitted to the OPR. The timing of the public review period is linked to the completion of the draft EIR. The lead agency must file a notice of completion with the OPR "[a]s soon as the draft EIR is completed" (Guidelines, § 15085) and public notice must be provided at the same time. (Guidelines, § 15087, subd. (a).) In this case, the notice of completion dated December 2, 2003, announced that the public comment period started on December 5, 2003, and ended on January 22, 2004. Excluding the first day, December 5, 2003, and including the last day since it was not a holiday (Code Civ. Proc., § 12), we count 48 days in the comment period. Publication on the 11th day resulted in a 42-day public comment period.

Citizens argue that the three-day reduction of the public comment period was noncompliance. City responds that Citizens' insistence on 45 days' notice "is mistakenly premised on section 21091[, subdivision] (a) and CEQA Guidelines sections 15203[7] and 15205[, subdivision] (d). These authorities pertain to the length of the public review period, *not the number of days prior to the end of the public review period that the public agency must provide notice of availability.*" (Italics added.) This remarkable statement says that while the agency has to provide a 45-day review period, it does not have to announce it in time for the public to have 45 days to respond.

■ The legislative intent of CEQA is to the contrary. "Full compliance with the letter of CEQA is essential to the maintenance of its important public purpose." (*Environmental Protection Information Center, Inc. v. Johnson* (1985) 170 Cal.App.3d 604, 622 [216 Cal.Rptr. 502].) " '[W]e must be satisfied that [administrative] agencies have fully complied with the procedural requirements of CEQA, since only in this way can the important public purposes of CEQA be protected from subversion.' [Citation.] At least, when these protective provisions go to the heart of the protective measures imposed by the statute, failure to obey them is generally 'prejudicial'; to rule otherwise would be to undermine the policy in favor of the statute's strict enforcement." (*Id.* at pp. 622–623.) Depriving the public of the full public comment period "thwart[s] the legislative intent underlying CEQA." (*Ultramar, Inc. v. South Coast Air Quality Management Dist.* (1993) 17 Cal.App.4th 689, 700 [21 Cal.Rptr.2d 608].) "[S]ubstantial rather than complete compliance with CEQA-mandated notice procedures [is] an abuse of discretion requiring vacating of the administrative decision." (*Environmental Protection Information Center, Inc. v. Johnson, supra,* 170 Cal.App.3d at p. 622 [216 Cal.Rptr. 502].) City's 42-day notice by publication did not

---

[7] Guidelines section 15203 requires the lead agency to provide adequate time for other public agencies and members of the public to review and comment on a draft EIR or negative declaration.

comply with section 21091, subdivision (a). This is not fatal, however, because City used other methods of giving notice.

2. Mailing. Citizens assert City cannot demonstrate that it complied with section 21092, subdivision (b)(3)(C), by mailing notice both to owners and occupants of properties contiguous to the project and within 300 feet, and with section 21092, subdivision (b)(3), by mailing notice to the names on the list of persons who previously requested notification.

The administrative record includes a copy of the NOA dated December 3, 2003, on which City Planner II Melissa Durkin affixed a "Post-it" note addressed to Planning Commission Clerk Kelly Felice. The note stated: "Here is the Notice of Availability. Please send to properties w/in a 300' radius as well as to all people on your list." The next page in the record is a list of names and addresses of 30 individuals, groups, and agencies. Durkin testified at the planning commission meeting on February 5, 2004: "First, we sent out a notice of preparation, not only to the agencies who typically would receive it, but also to people who live within 300 feet of the project, as well as everybody who expressed interest in this project. [¶] We held the scoping meeting on July 29th, 2003, which we invited the same group of people to, and we also allowed public input at the August Planning Commission meeting, which actually was held in July."

At the city council meeting on February 17, 2004, when the architectural and site review request for the project was being considered, Durkin stated, "We sent out a notice of availability when the EIR was prepared, which we sent not only to the agencies we normally send it to, but also to that group of people who indicated an interest in the project. We held an after-hours session to distribute the EIR, in case people weren't able to come to City Hall before 5:00 o'clock. [¶] We sent a letter to the editor of the *Dispatch* to let people know that the EIR was available and what the public hearings time frame was. And we also did not put any time limit on the EIR review. In addition, we published project information on the City website."[8]

Citizens complain that in the absence of evidence about the date of mailing, the note from Durkin to Felice requesting mailing was "only evidence of intent to mail, not that the mailing took place." Similarly, Durkin's statement that "[w]e sent out a notice of availability" is not evidence of mailing in the absence of an explanation how Durkin knew the notice was sent and when it was sent. Furthermore, "the occupants of the 'contiguous property' are commercial tenants, not people who live in residences. The Record includes no evidence that the occupants of the commercial properties were mailed notice."

---

[8] From the context, Durkin is referring to the draft EIR.

Durkin's description of the individuals who received mail notice is ambiguous. Do "people who live within 300 feet of the project" and "properties w/in a 300' radius . . ." mean, in the language of the statute, "owners and occupants of contiguous property"? (§ 21092, subd. (b)(3)(C).) We think they do.

■ First, there is no evidence in the record that the two descriptors, "people who live within 300' of the property" and "properties w/in a 300' radius" together did not result in notice to "owners and occupants of contiguous property," even if the owners or occupants were commercial entities. Second, Durkin's testimony and planning department documents in the record, namely, the mail contact list of agencies and individuals to whom notice was sent, the publication certificate from the Gilroy Dispatch, the county clerk's certification of posting of the notice, as well the placing of notice of EIR circulation information and dates for public hearings on City's Web site, and Durkin's December 4, 2003 e-mail to the editor of garlic.com stating that the draft EIR was available for inspection from December 5 through January 22, establish City's good faith effort to follow the procedures prescribed by law for giving notice.[9] In connection with section 21092, "the Legislature . . . affirm[ed] the general principle that statutory requirements for public notice are fulfilled if the public agency makes a good faith effort to follow the procedures prescribed by law for giving notice. (Stats. 1980, ch. 131, § 4, p. 304.)" (*Newberry Springs Water Assn. v. County of San Bernardino* (1984) 150 Cal.App.3d 740, 746 [198 Cal.Rptr. 100].) Good faith was demonstrated.

Next, we find substantial evidence in the record to show that the mailing to the required parties timely took place. The December 2, 2003 notice of completion sent to the OPR shows that the draft EIR was completed three days before the review period started on December 5. The NOA with the note from Durkin to Felice to mail the notice was dated December 3. A comment received from the Santa Clara Valley Water District, one of the agencies on the notification list, stated that it received the draft EIR on December 8. Receipt of the notification on December 8 still left 45 days to comment by the close of the review period on January 22, 2004.

There is no evidence in the record that other parties who were mailed the NOA did not also receive it in a timely fashion. The water district and other agencies on the mailing list responded in a timely fashion[10] and 37 individuals testified before the planning commission. After the comment period, 86

---

[9] Felice executed certificates of mailing for the notice of preparation of the draft EIR and notice of the scoping meeting. A lot of trouble could have been avoided if Felice had executed a certificate of mailing for the NOA.

[10] The response of the Bay Area Air Quality Management District (BAAQMD), dated January 22, 2004, arrived at the planning department on January 28, 2004, after the close of

individuals testified at the city council hearings. There was no evidence in the record showing that any individual or agency who wished to comment failed to receive notice in a timely fashion and therefore lost the opportunity to comment, nor do Citizens assert so. These facts and Durkin's testimony that the planning department sent out the NOA when the draft EIR was prepared support the inference that the notices were mailed in time to give the recipients the required 45 days in which to comment. This circumstantial evidence, the absence of evidence to the contrary, plus the presumption that official duty was regularly performed (Evid. Code, § 664) support our conclusion that City timely mailed the NOA to the entities and individuals who previously requested notice (§ 21092, subd. (b)(3)) and timely mailed notice to the owners and occupants of contiguous property shown on the latest equalized assessment roll. (*Id.*, subd. (b)(3)(C).)

3. Response to comments. Next, Citizens contend that despite the finding in the resolution certifying the EIR that public agencies received copies of the EIR in response to their comments on February 4, 2004, there is no evidence that City did so. Citizens correctly state that City, as the lead agency, had to provide any agency that commented on the EIR with a written response 10 days before certification. (§ 21092.5, subd. (a); Guidelines, § 15088.)

■ Local agencies may comply with section 21092.5, subdivision (a), by providing "[c]opies of responses or the environmental document in which they are contained, prepared in conformance with other requirements of this division and the guidelines adopted pursuant to Section 21083."[11]

The final EIR included a "copy of each correspondence received during the public review period" with a response "immediately following the letter. Where required, revisions [had] been made to the text of the Draft EIR based on the responses to comments, and [those] are included in Section 4, Changes to the Draft EIR." The record shows that Durkin sent the planning commission copies of the final EIR on February 4, 2004. However, there is no certificate of mailing, other document, or testimony in the record to expressly establish that Durkin sent commenting agencies copies of the final EIR, as the city council found.

---

the comment period. City had no obligation to respond in writing. (§ 21092.5, subd. (c).) Nevertheless, the final EIR contained a written response to BAAQMD's comments.

[11] The Guidelines state the lead agency "shall evaluate comments on environmental issues received from persons who reviewed the draft EIR and shall prepare a written response . . . during the noticed comment period and any extensions and may respond to late comments." (Guidelines, § 15088, subd. (a).) "The response to comments may take the form of a revision to the draft EIR or may be a separate section in the final EIR." (*Id.*, subd. (d).) A lead agency may, but is not required, to provide an opportunity for review of the final EIR by the public or commenting agencies before approving the project. (Guidelines, § 15089, subd. (b).) If a lead agency sends a commenting agency a copy of the final EIR, the final EIR may not be certified until 10 days later. (§ 21092.5; Guidelines, § 15088, subd. (b).)

Nevertheless, the record contains substantial evidence that City complied with section 21092.5. There is "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) Factual testimony of agency staff based on personal knowledge is substantial evidence. (*Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at p. 1380.)

Furthermore, based on an examination of the whole record a fair argument can be made that the final EIR was sent to the commenting agencies and made available to the public. First, the EIR contains responses to all comments received. Second, Durkin, who was in charge of the preparation of this EIR, sent the final EIR to the city council on February 3, 2004, and it is apparent from evidence presented to the city council thereafter that Durkin provided the final EIR to both agencies and individuals. For example, a February 17, 2004 letter from Citizens' Attorney Kopper commented on perceived flaws in both the draft EIR and the final EIR. Kopper would not have responded to City's responses if it had not received them. Orally, at the evening February 17 city council meeting, speakers commented on the EIR's treatment of air pollution, traffic, and economic issues. At the end of the meeting, the city council had a list of 12 concerns the planning department was to address at the next regular meeting. The record contains Wal-Mart's response to this list, opposition letters, a petition signed by 1,184 residents asking for a "non-partisan, thorough economic impact study specific to Gilroy," a previously received petition with 831 signers in favor of the Supercenter, and a letter signed by Ernest and Val Felice of the Gilroy Village Shopping Center and 23 owners of 18 businesses asking for an additional economic impact study. A Gilroy Dispatch poll reported 54 percent opposed to the Supercenter.

Although circumstantial evidence of compliance with section 21092.5, subdivision (a), appears in the record, we also inquire "whether the record contains evidence [the agency] *failed* to comply with the requirements of its . . . regulatory program. In the absence of contrary evidence, we presume regular performance of official duty. (Evid. Code, § 664.)" (*City of Sacramento v. State Water Resources Control Bd., supra,* 2 Cal.App.4th at p. 976.)

■ Citizens have not shown that the city council's finding that preparation of the EIR complied with CEQA regulations was erroneous. The record as a whole supports a fair argument that City complied with section 21092.5, subdivision (a), and that City provided responses to comments.

## EXCLUSION OF URBAN DECAY IMPACTS

Next, Citizens claim that the EIR failed as an informational document because it excluded an analysis of the project's blight and urban decay impacts.[12] From the beginning of the EIR process, members of the public requested that City study the physical impacts on the environment of economic changes caused by the Supercenter. Notwithstanding, in the final EIR, City simply stated that the city council had previously voted that the economic impact analysis prepared for the entire Rincon Plaza annexation area (identified later in the draft EIR as the Spectrum report) was adequate to address those concerns and additional study was not needed for the Supercenter.

Citizens claim there is reversible error in (1) City's failure to complete an initial study before deciding to rely on the Spectrum report; (2) City's failure to follow required CEQA procedures in deciding whether the urban decay impact was potentially significant and should be studied in the draft EIR; and (3) the EIR's failure to assess economic/physical impacts when the evidence in the record suggested that such impacts could occur.

1. Initial study. Citizens claim that in failing to prepare an initial study for the Wal-Mart EIR, "City produced no information as to whether the 1992 Spectrum Study was sufficient to address the potential . . . urban decay impacts of the Supercenter, which were raised during the scoping sessions. . . . [T]he city council made a political decision to rely on the Spectrum Study for the Project's . . . urban decay impacts. The Council deliberations concerning use of the Spectrum Study are not part of the record. [¶] . . . Furthermore, at the time the Spectrum Study was completed Supercenters did not exist. No reasonable reading of the Spectrum Study would lead to the conclusion that it analyzed the unique impacts of a Supercenter."

An initial study is not required "[i]f the lead agency can determine that an EIR will clearly be required for the project," although such a study may still be desirable. (Guidelines, § 15063, subd. (a).) "A primary function of an initial study is to provide the lead agency with information to use as the basis for deciding whether to prepare an EIR or a negative declaration."

---

[12] Some comments in the administrative record refer to "blight and urban decay." "Blight" is a term used in community redevelopment law. (Health & Saf. Code, § 33000 et seq.) A "blighted area" for purposes of the community redevelopment law is generally characterized by a combination of specified conditions, including unsafe or abandoned buildings, excessive vacant lots, high crime rates, incompatible uses of adjacent properties, depreciated or stagnant property values or impaired investments, abnormally high business vacancies and a lack of necessary commercial facilities. (*Redevelopment Agency v. Rados Bros.* (2001) 95 Cal.App.4th 309, 314 [115 Cal.Rptr.2d 234].) The term "blight" has not been shown to be applicable in this case.

(Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2004) §§ 6.4, 6.6, pp. 255–256 (citing Guidelines, § 15063, subd. (b)(1)).) "If the lead agency's preliminary review [citation] shows that the project will require an EIR, an initial study is not required, and the agency may start preparing the EIR." (Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 6.6, p. 256.)

"Where a prior environmental impact report has been prepared and certified for a . . . plan, . . . the lead agency for a later project that meets the requirements of this section [section 21094[13]] shall examine significant effects of the later project upon the environment by using a tiered environmental impact report, except that the report on the later project need not examine those effects which the lead agency determines were either (1) mitigated or avoided pursuant to paragraph (1) of subdivision (a) of Section 21081 [authority for requiring changes or alterations which mitigate or avoid the significant effects on the environment] as a result of the prior environmental impact report, or (2) examined at a sufficient level of detail in the prior environmental impact report to enable those effects to be mitigated or avoided by site specific revisions, the imposition of conditions, or by other means in connection with the approval of the later project." (§ 21094, subd. (a).)

In the instant case, given City's determination that an EIR was required, an initial study was not necessary. The Supercenter project was a "later project" which was consistent with the 2002–2020 general plan for which an EIR had been prepared and certified and in which the effects of later development were examined at a sufficient level of detail.[14] Furthermore, the Supercenter was consistent with local land use plans and zoning in the area where it

---

[13] Section 21094, subdivision (b) "applies only to a later project which the lead agency determines (1) is consistent with the program, plan, policy, or ordinance for which an environmental impact report has been prepared and certified, (2) is consistent with applicable local land use plans and zoning of the city . . . in which the later project would be located, and (3) is not subject to Section 21166 [EIR required when substantial changes in the project require major revisions of a previously-prepared EIR]."

[14] The draft EIR for the draft general plan was prepared with just this purpose in mind. It stated it was "being prepared as a 'program' EIR . . . for a series of actions that are related geographically, or as part of a series of actions; for adopting rules, regulations, plans or general criteria for a continuing program; or for individual activities carried out under the same authorizing law or regulation. Environmental documentation for future individual projects that are proposed in accordance with the General Plan will be tiered to this EIR to the extent this program-level analysis remains adequate for such purposes in accordance with Section 15152[, subdivision] (b) of the State CEQA Guidelines." The EIR stated the "goals, policies and implementing actions contained in the General Plan . . . are intended to be self-mitigating (to reduce impacts to a less-than-significant level). The Plan builds upon City policies established in past General Plans and other City planning documents to preserve the community's quality of life, protect environmental resources and public health and safety, and to address issues related to future growth and change in the community." Specific impacts considered in the plan

would be located, and did not require major revisions in a previously prepared EIR. (§ 21094, subd. (b).) An initial study was not required.

2. Tiering. The Wal-Mart draft EIR states it tiered from the Gilroy Highway 152 Retail Center mitigated negative declaration and initial study and the 2002–2020 General Plan EIR. Citing Guidelines section 15152, subdivision (a), Citizens say "[a]n EIR cannot be tiered from a negative declaration as a first tier document."

Guidelines section 15152, subdivision (a) defines "tiering" as "using the analysis of general matters contained in a broader EIR (such as one prepared for a general plan or policy statement) with later EIRs and negative declarations on narrower projects; incorporating by reference the general discussions from the broader EIR; and concentrating the later EIR or negative declaration solely on the issues specific to the later project. [¶] (b) . . . Tiering is appropriate when the sequence of analysis is from an EIR prepared for a general plan, policy, or program to an EIR or negative declaration for another plan, policy, or program of lesser scope, or to a site-specific EIR or negative declaration." "When tiering is used, the later EIRs or negative declarations shall refer to the prior EIR and state where a copy of the prior EIR may be examined. The later EIR or negative declaration should state that the lead agency is using the tiering concept and that it is being tiered with the earlier EIR." (Guidelines, § 15152, subd. (g); § 21094, subd. (e).)

This is exactly what the Wal-Mart draft EIR did. It states it "is tiered from the *Gilroy Highway 152 Retail Center Mitigated Negative Declaration* . . . and the City of Gilroy Revised General Plan EIR . . . . [These] documents, and the *Rincon Plaza* [EIR], are incorporated herein by reference. Copies of the *Gilroy Highway 152 Retail Center Mitigated Negative Declaration*, the *Gilroy 2002–2020 General Plan*, and the City of Gilroy Revised General Plan EIR are available for review at the City of Gilroy Planning Division, 7351 Rosanna Street, Gilroy, during regular business hours. The mitigation monitoring program from the *Gilroy Highway 152 Retail Center Mitigated Negative Declaration* is included for reference in Appendix A." The draft EIR also advises that "[t]wo previous environmental documents have been prepared for the project site," the Rincon Plaza EIR and the Gilroy Highway 152 Retail Center Mitigated Negative Declaration with initial study. The final EIR does not reiterate this notification, but it states that it, along with the draft EIR, "constitutes the complete Gilroy Wal-Mart (Pacheco Pass) EIR."

---

included cumulative impacts of region-wide growth and known areas of controversy such as traffic and effects of economic development and local growth on jobs.

The first tier documents developed a plan for the entire Rincon Plaza annexation area. They are the Spectrum report and the Rincon Plaza EIR. When planning for the Rincon Plaza annexation area narrowed to focus on the "subdivision of a 97-acre site into 18 commercial parcels and development of commercial and possibly industrial uses . . . in two phases" in 2001, the Gilroy Highway 152 Retail Center initial study[15] was prepared, and the Gilroy Highway 152 Retail Center mitigated negative declaration was approved and adopted, as was a tentative map approval for the subdivision.

The focus narrowed even more in 2002, when the architectural and site review application for the Supercenter and analyses and reports studying it were prepared between June and December 2002, followed by the preparation and approval of the site-specific Wal-Mart EIR in 2003 to 2004. The Wal-Mart EIR identified itself as the culmination of the planning process for its particular site by referring back to the beginning of the development process and incorporating by reference the documents and studies on which it relied, specifically including the City of Gilroy revised general plan EIR, the Rincon Plaza EIR, and the Gilroy Highway 152 Retail Center mitigated negative declaration.

The Wal-Mart EIR clearly notified interested persons of its genealogy. The Supercenter project was consistent with Gilroy's general plan and did not contain substantial changes from the uses contemplated in that plan, the Spectrum report, or the EIR's. The Wal-Mart EIR did not mislead the public as to the identity of the environmental documents on which City relied.

3. Failure to follow CEQA procedures. Next, Citizens assert City did not follow CEQA procedures in determining that urban decay impacts need not be addressed in the Wal-Mart EIR, and that City violated CEQA in not explaining in the EIR why urban decay impacts were considered less than significant. Citizens state that both the draft and final EIR's acknowledge that the project's impacts on the central business district and other businesses were a matter of concern.[16]

The final EIR stated: "CEQA Guidelines section 15131 provide the City with a choice to include economic or social information in an EIR or in

---

[15] The Gilroy Highway 152 Retail Center initial study stated it tiered from the Rincon Plaza EIR.

[16] Wal-Mart counters that Citizens waived this claim of error by failing to raise this claim in the superior court in their opening brief. The issue is raised in the section entitled, "THE EIR FAILED TO CONSIDER THE PROJECT'S ECONOMIC IMPACTS THAT MAY LEAD TO URBAN BLIGHT."

whatever form the City desires. The City prepared an economic impact analysis for the entire Rincon Plaza annexation area (the project site and adjacent land roughly bounded by State Highway 152 and Ronan Channel) in 1992. The City determined by a vote of the city council, that the previously prepared economic analysis was adequate to address the currently proposed project within that same study area. [¶] . . . [¶] There is no substantial evidence that the Project will have any economic impacts that are reasonably likely to cause significant adverse physical change, such as blight, in the City. Therefore, the EIR need not include an analysis of blighting effects of big box retail outlets on local economies."

█ The reports incorporated in the final EIR found that the flow of retail business to suburban malls was in full spate when the Rincon Plaza annexation was conceived, that a later-phased project such as the Supercenter would have no effect on the trend, and that rejection of the Supercenter would not slow or stop it. Nevertheless, the issue was red hot when approval of the Supercenter was before the city council. Some of the controversy arose because the Spectrum report and the Rincon Plaza EIR were around 12 years old and members of the public, who were currently aware of urban decay— declining sales in stores in the downtown area, businesses closing, jobs leaving, and the real estate the businesses had occupied standing empty— understandably wanted the city council to take these circumstances into account. The firsthand observations of individual commentators "should not casually be dismissed as immaterial because 'relevant personal observations are evidence.' [Citations.]" (*Bakersfield Citizens*, *supra*, 124 Cal.App.4th at p. 1211.)

Nevertheless, despite City's refusal to commission further studies, the city council had a fully developed picture of the economic impacts of the Supercenter project. Relevant information came from the Rincon Plaza EIR and the Spectrum report plus information obtained during the hearing process. The whole record provides substantial evidence that urban decay was adequately considered in connection with the Supercenter. As stated *ante*, " '[s]ubstantial evidence' as used in these guidelines means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made . . . is to be determined by examining the whole record before the lead agency." (Guidelines, § 15384, subd. (a).)

In 1992, the Spectrum report defined Gilroy as part of an economic region which included Morgan Hill, Gilroy, and San Benito County. The report expected about 1,500 additional full- and part-time retail jobs and 2,000 other jobs resulting from development in the industrial park. Since 1988, Gilroy's

taxable sales had grown at more than three times the rate of state taxable sales. "Gilroy [wa]s capturing the low-cost, high volume outlet centers and 'mega-stores' which [we]re dominating the growth of the retail sector." The report stated that "[t]he region's growth rate in apparel and general merchandise is stunning . . . although [Gilroy] is losing share in general merchandise." The report noted the success of Gilroy auto dealers, forecast that retail sales would double over the next decade with population and income growth each at 30 percent or more, and, based on a survey of shoppers' vehicles at the "existing outlet center," stated that 90 percent of shoppers came from outside Gilroy. That section of the report concluded, "[t]he space will be built, the shoppers will arrive and the jobs will be provided somewhere within about 10 miles of Gilroy. Gilroy can take the jobs and tax income for itself, or leave it to someone else."

The central business district (CBD)'s commercial future was not as rosy. The Spectrum report noted some of the CBD stores "are out of date. The existing Outlet centers have already cut into [CBD] retail sales." A table comparing estimated taxable sales of apparel and general merchandise in the CBD versus outlet center sales showed dollars per square foot declining in the CBD from $109 in 1988 to $82 in 1991. Outlet sales in 1990 were $302 per square foot, and, in 1991, totaled $320 per square foot.[17] The report added that if the entire outlet center was "actually achieving the $350 per square foot sometimes bragged about, the CBD decline in apparel and general merchandise sales is even greater. On the other hand, CBD sales in eating out and other retail activities have increased."

The report predicted that construction of Rincon Plaza would "modestly add to this inevitable process of shifting Gilroy's Central Business District to specialized retail, professional services, and restaurants. [It] will increase the business for new specialized business in the CBD as well as displace a small portion of the remaining CBD retail volume. The loss of some traditional CBD retail business is inevitable. Gilroy has the choice of losing business to its own regional shopping center (Rincon Plaza) or to regional centers in other communities." The report suggested that "[d]owntown . . . capitalize on government activities such as City Offices and the long range need for County courts in the South County area." The report concluded that the industrial park would provide job opportunities for "currently unemployed Gilroy residents, who are unable or unwilling to commute long distances," and it identified decreased commutes for Gilroy residents and increased general economic attractiveness of both Gilroy and the region to residents and businesses as secondary benefits from the project.

---

[17] The table reports the latter figure with reference to "phase I" and "phase II" for the outlet stores.

The Spectrum report, if unsupplemented in the EIR, would have failed to give adequate detail for identification of the CBD area studied, the businesses involved, and the type of physical effects the economic changes were visiting on the environment. The Spectrum report failed to describe the amount of commercial space involved and the kinds of businesses affected. Nor did it describe existing impacts (such as store closures, job losses, and storefront vacancies) and identify project impacts which could be expected to affect the CBD in the future.

The Rincon Plaza EIR and other evidence cured that deficiency. The Rincon Plaza EIR identified four commercial areas: downtown Gilroy (Monterey Street from First Street to Tenth Street), Tenth Street (from Alexander to Chestnut Streets), First Street (from Monterey Street to Kelton Drive), and the outlet center located at Leavesley Road and Highway 101. The report stated the number of square feet in commercial use in each major building and each area, identified the uses (for example, general merchandise anchor store, bank, fast food, miscellaneous retail), and noted generally which major stores had closed and which areas had vacancies.

The Rincon Plaza EIR attributed the shift in commercial activity from downtown areas to suburban malls to the malls' being "newer, their stores are coordinated by the mall management, they are generally larger than most downtown areas, they have adequate built-in parking, and they have become more easily accessible in an auto-dominant society. . . . [¶] . . . Strong regional malls have opened up in Salinas and south San Jose which offer apparel and general merchandise in an attractive and modern setting with easy access by automobile."

Specific factors already impacting the CBD identified in the Rincon Plaza EIR included the openings of the Kmart on Tenth Street, Cochrane Plaza in Morgan Hill (which had Mervyn's and Ross department stores), and Ford's department store in Morgan Hill (which had "dramatically reduced the sales of the Ford's department store in the Gilroy CBD").

The Rincon Plaza EIR concluded the CBD could not be protected by disapproving additional retail development in Gilroy. It stated, the "principal consequence of denying viable new retail development would be to lose potential overall sales revenue in Gilroy to other cities." The Rincon Plaza EIR found the adverse economic impacts on the CBD resulting from the proposed project to be "small in comparison to the effects from competing suburban mall and retail service areas which have been constructed in the surrounding region in the recent past. Due to competition from more-modern

retail shopping facilities, future declines in CBD sales will likely result even if the proposed project is not constructed. The proposed project will therefore not result in a significant impact on the Gilroy CBD. [¶] . . . [¶] No mitigation measures are necessary."

Other urban decay and economic impact on the physical environment evidence came from Citizens, Wal-Mart, and others who sent the planning department up-to-date information on the economic, fiscal, and sociological impacts of "big-box" and "supercenter" stores. Citizens submitted two reports and Wal-Mart one. At the March 15, 2004 city council meeting, council members discussed the objectivity of the reports and the reason for inclusion or exclusion of certain facts, and allowed further testimony from individuals on grocery industry reports which contradicted conclusions in the Wal-Mart-sponsored report that the Supercenter would not have a strong negative impact on existing grocery stores.

One councilman observed that Wal-Mart had been in the community for 10 years, although it appeared from "the emails [that] a large number of [correspondents] believe that we're going to either have a second Wal-Mart come into town or that Wal-Mart is new to our town." He stated that "[w]e've already felt the impact . . . [B]usiness has already adjusted to Wal-Mart being in town."

The building Wal-Mart was vacating had been sold contingent on approval of the Supercenter. The purchaser planned renovations of the building for a mix of merchants, retail sales, and entertainment. Wal-Mart agreed that if the vacated building was not put to use within 12 months (extendable by 12 more months) of the Supercenter's obtaining a certificate of occupancy, Wal-Mart would demolish it.

This record establishes that additional formal studies would not add information not already available to the city council for decisionmaking when it voted to approve the project. We conclude that the urban decay impact of commercial and industrial development in the Rincon Plaza annexation area was adequately studied, and that the city council was justified in finding further study of its impact in the Supercenter project was not warranted.

## MITIGATION MEASURES

Next, Citizens complain that the Wal-Mart EIR did not include an air quality study and that it failed to adopt "recommended and feasible air

quality mitigation measures." They assert that although the Wal-Mart "EIR states that it includes 'additional study . . . to determine if there would be project-specific measures that could further reduce the level of impacts,' [n]o such 'additional study' . . . is included in the Project EIR."

1. Air pollution. Air quality was studied in preparation for the 2002-2020 general plan. That plan acknowledged that prevailing winds carry pollutants from the northern part of the Santa Clara Valley into the Gilroy area particularly in the dry summer months and that Gilroy suffers some of the worst air quality in the nine-county Bay Area. The Wal-Mart EIR concluded that air pollution from ozone formation, low-level air inversions on summer days, and other conditions exacerbate the valley's air pollution problems. Asthma directly related to air pollution was a serious problem in Gilroy. Nevertheless, the Wal-Mart EIR concluded that air pollution was a significant and unavoidable impact and approved the Supercenter on the basis of a statement of overriding considerations.

The Wal-Mart EIR stated, "Measures to achieve reductions in air emissions are required by *Gilroy 2002-2020 General Plan* policies, the Gilroy Revised General Plan EIR, and the *Gilroy Highway 152 Retail Center Initial Study*, but these would not reduce impacts to a less than significant level. There are no project-specific characteristics that make the previous analysis inadequate, and based on CEQA Guidelines section 15183 the proposed project's effects on air quality require no further study. However, additional study was performed to determine if there would be project-specific measures that could further reduce the level of impact. Additional measures were added, but the impact to air quality would remain significant and unavoidable. A statement of overriding considerations would be required for the proposed project."

Citizens complain this "additional study" is not in the EIR. Failure to expound on the additional study was not an error. " ' "CEQA does not require analysis of every *imaginable* alternative or mitigation measure." ' " (*Concerned Citizens, supra,* 24 Cal.App.4th at p. 841.) No feasible mitigation measures that would substantially lessen or avoid environmental impacts had been proposed beyond those recommended in the EIR, all of which were adopted. A lead agency's "duty to condition project approval on incorporation of feasible mitigation measures only exists when such measures would [avoid or] 'substantially lessen' a significant environmental effect." (*San Franciscans for Reasonable Growth v. City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1519 [258 Cal.Rptr. 267].) "Thus the agency need not, under CEQA, adopt every nickel and dime mitigation scheme brought to its attention or proposed in the project EIR." (*Ibid.*)

2. BAAQMD comments. Citizens also complain that "BAAQMD criticized the proposed list of air quality measures as being inadequate, and requested that the following measures, among others, be incorporated in the Project," namely, construction of transit amenities, shuttle service until transit services extended to the project, and nitrous oxide "mitigation measures for construction equipment." Citizens criticize the adequacy of the final EIR's response to BAAQMD's comments and complain that stating "[t]he comment is acknowledged" in response to the suggestions for construction of transit amenities, etc., is not proof that the city council gave "meaningful consideration" to the proposed mitigation measures.

Citizens misread BAAQMD's letter and oversimplify City's responses. BAAQMD's letter contained six "additional comments," none of which state that "the proposed list of air quality measures" was "inadequate." The letter states that BAAQMD's staff "continue[s] to have concerns about the project's air quality impacts"; and notes that the project is inconsistent with its reading of the Gilroy general plan update (BAAQMD believed Gilroy envisioned itself as a "compact community that 'will first grow inward through infill development, and then concentrically outward from its historic core'"). Nevertheless, BAAQMD continued, if City determined that the proposed site was an appropriate location for the project, then BAAQMD would recommend that City do "as much as possible to reduce vehicle trips associated with the project." The letter suggested the additional measures mentioned *ante*.

City responded that the Supercenter was consistent with the 2002-2020 general plan, not for the downtown component, but for the component for the area east of Highway 101 which was "specifically planned for large-scale uses primarily designed to serve automobile-oriented regional access and use." City acknowledged BAAQMD's other comments and stated City included mitigation measures "feasible to implement at the project site." City stated it had previously considered implementation of shuttle service but determined that it was not economically feasible; that it would consider requiring employee motivation measures and construction equipment emissions reduction measures before approving Wal-Mart's emission reduction program; and that a large amount of parking was provided because customers were "expected to buy large numbers of goods and would need an automobile to bring their purchases home."

Additional facts were included in the EIR, such as that design work had started on the Camino Arroyo Bridge over Ronan Channel, and also, that grease and oil separators and water filtration systems for water draining into Ronan

Channel, construction emissions and dust control measures, and other requirements to protect air quality, were required. The EIR stated that bus service would be extended to the project site when the Camino Arroyo Bridge was built, which City expected to occur within three to five years; that physical improvements to accommodate bus service were provided at the Supercenter site, and that the EIR required payment of fees for transportation infrastructure improvements.

█ Responses to comments need not be exhaustive; they need only demonstrate a "good faith, reasoned analysis." (Guidelines, § 15088, subd. (c); see *Towards Responsibility in Planning v. City Council* (1988) 200 Cal.App.3d 671, 683 [246 Cal.Rptr. 317].) " '[T]he determination of the sufficiency of the agency's responses to comments on the draft EIR turns upon the detail required in the responses. [Citation.] Where a general comment is made, a general response is sufficient.' " (*Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859, 878 [134 Cal.Rptr.2d 322].) " '[A]n EIR is presumed adequate [citation], and the [petitioner] in a CEQA action has the burden of proving otherwise.' " (*Al Larson, supra*, 18 Cal.App.4th at p. 740; see § 21167.3.) Satisfactory responses to comments " 'may be provided by reference to the EIR itself.' " (*Twain Harte Homeowners Assn. v. County of Tuolumne* (1982) 138 Cal.App.3d 664, 686 [188 Cal.Rptr. 233].)

The responses in the final EIR were sufficient. Citizens have not demonstrated that any inadequacy in the responses was prejudicial. The BAAQMD's comments were adequately considered.

3. Emissions reduction program. Next, Citizens claim that City's inclusion of the emissions reduction program of the Rincon Plaza EIR as a requirement of project approval is impermissible under CEQA according to *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 307 [248 Cal.Rptr. 352] (*Sundstrom*).

In *Sundstrom*, the reviewing court set aside approval of a conditional use permit authorizing construction of a private sewage treatment plant because the county violated CEQA by finding the project would result in less than significant air quality impacts and then requiring the applicant to adopt mitigation measures to be recommended by a future study to be conducted by the applicant and by delegating the county's legal responsibility to assess environmental impacts to the planning commission staff by making the applicant's studies subject to planning commission staff approval. (*Sundstrom, supra*, 202 Cal.App.3d at pp. 306–308.)

Unlike the county in *Sundstrom*, City did not defer its environmental assessment or determine that the project would result in less than significant air quality impacts without proper studies. On the contrary, the Rincon Plaza EIR, having determined there would be significant air quality impacts from development, required project applicants, "as a project implementation step and as part of the design of any specific construction project, . . . [to] prepare an emission reduction program in order to minimize the vehicle-related pollutant emissions generated by the proposed project. . . . The program shall, at a minimum, consist of the following two measures. [*Sic.*] In addition, the emission reduction program should include analysis of the feasibility of installing a park-and-ride lot and promotion of an employee rideshare program." (Underscoring omitted.) The two measures following this paragraph required (1) provision of storage for bicycles of employees and customers and provision for employee shower and locker facilities and (2) provision for bike access to the project site.

These specific mitigation requirements are imposed on applicants based on studies and analyses conducted by the Rincon Plaza EIR. Implementation of City's requirements for construction projects is properly under the purview of the planning department. *Sundstrom* is inapplicable here.

4. Ronan Channel/Camino Arroyo Bridge. Citizens state the bridge was a necessary air pollution mitigation measure to reduce vehicle emissions because bus service to the Supercenter would start when the bridge was built; the bridge would provide a more direct route to the Supercenter than any currently available from most of Gilroy; and the bridge would allow pedestrians and cyclists to more easily access the Supercenter, thus reducing air pollution from vehicular traffic. Citizens also complain that the EIR failed to respond to public comments that the bridge was needed to mitigate air quality impacts,[18] that it was required as a mitigation measure by the higher tier

---

[18] The Valley Transportation Authority comment to the draft Wal-Mart EIR cautioned that the extension of transit services to the Wal-Mart project would require construction of the bridge for "a contiguous link to the Outlet Stores." City responded that "[m]itigation measures require the accommodation of transit service, specifically turnouts (already in place) and sidewalks connecting from transit stops to stores. Transit service is not expected until the Camino Arroyo Bridge has been completed." Citizens also state, "Connie Rogers commented that the Bridge was necessary as partial mitigation for the Project's air quality impacts." Rogers's written comment to the draft Wal-Mart EIR asked, "what will trigger the completion of the Camino Arroyo [B]ridge over the Ronan Channel?" She stated that the BAAQMD letter suggested mitigation measures and asked "[w]hy are none of the suggested mitigation measures [of] the bridge over Ronan Channel being required as at least partial mitigation?" City responded to Rogers that design work on the bridge has begun and that the City expected completion within three to five years. City did not believe construction of a temporary bicycle and pedestrian bridge was warranted because design work on the road bridge was already underway and a footbridge "might not be ready for use substantially sooner than the planned road bridge."

Rincon Plaza EIR, and that the EIR was defective for failing to explain how elimination of the bridge was consistent with the Rincon Plaza EIR.

Citizens claim the Rincon Plaza EIR required the bridge to be built before any building permits could be issued after completion of the first phase of the project. This claim is belied by the record.

The Rincon Plaza EIR anticipated seven retail commercial and industrial phases of development although no specific construction project had been proposed at the time the EIR was prepared. The first two phases contemplated retail development, although some industrial development was possible in phase II. As carried out, phase I resulted in construction of the Lowe's and Costco and other retail-related projects and the then-ongoing phase II included the Wal-Mart Supercenter. The industrial portion of the project, called "Project Build-Out" in an addendum to the resolution approving the Rincon Plaza EIR, was "expected to be developed after the complete build-out of the retail portion of the project."

The Ronan Channel Bridge is clearly excluded from phase II development. In discussing "project build-out" intersections, the Rincon Plaza EIR stated "[t]he Highway 152/Proposed New Boulevard intersection" "will extend from Highway 152 to the Ronan Channel. A crossing over the Ronan Channel will not be required as a part of the proposed project." From the Rincon Plaza EIR in 1993 to the Gilroy Highway 152 Retail Center initial study prepared in 2001,[19] the descriptions of the infrastructure conclude, "[n]o bridge across Ronan Channel is proposed as a part of the proposed project." In addition, the resolution approving the Rincon Plaza Project states, "[a] crossing over the Ronan Channel will not be required as a part of the proposed project."

Citizens contend, "[m]itigation measure 8(e) requires the Project Proponents or Assessment District to '[e]xtend Camino Arroyo north from across Ronan Channel to intersect Sixth Street across from the existing Camino

---

[19] The Gilroy Highway 152 Retail Center initial study stated that in phase I development, Camino Arroyo would be constructed between Highway 152 and the Ronan Channel for the area west of Camino Arroyo which would contain a hotel and retail uses. Phase II development would be located on the eastern portion of the project site and would consist of retail uses and potentially industrial uses. The infrastructure to be constructed included "[a] portion of Camino Arroyo . . . between State Highway 152 and the Ronan Channel. Eventually Camino Arroyo would be extended over a bridge to connect northward to Gilman Road, but this portion of the road is not a part of the proposed project and initially Camino Arroyo would serve only to provide access to the project site from State Highway 152."

Arroyo.'" They also assert, "City staff stated the . . . Bridge 'shall be designed, constructed and operational prior to occupancy of the [Supercenter] building.'"

The record stated above makes clear that the Ronan Channel Bridge was not intended to be considered as a mitigation measure for the Supercenter. The Wal-Mart final EIR section "Pedestrian, Bicycle and Transit Access" states, "[d]evelopment of the Camino Arroyo [B]ridge across Ronan Channel, . . . has been initiated by the City, but is not expected to be constructed for between three and five years." "City staff," specifically, traffic engineer Kristi Abrams speaking at the February 17, 2004 city council meeting, stated that scoping for the Camino Arroyo Bridge had started and that community outreach hearings were being planned. The quote Citizens attribute to "City staff" was written in a December 2002 memo from Durkin to Newman when City was studying the acceleration of construction of the Camino Arroyo Bridge prior to occupancy of the Supercenter out of concern for pedestrian safety. City was concerned that the store would "attract[] a large amount of foot traffic from west of the freeway." BAAQMD had also "urge[d] the City to expedite the construction of the proposed bridge across Ronan Channel so that safe and convenient pedestrian and bicycle access can be provided sooner than the proposed 3–5 year timeframe."

In response, on March 10, 2003, City retained Higgins Associates for a traffic impact study report (discussed *post*). Higgins determined that the public safety concern about pedestrians taking a dangerous short cut across Ronan Channel to the Supercenter could be solved by construction of a fence along Ronan Channel. They recommended this approach. City accepted this recommendation and in a March 24, 2003 letter, instructed Newman to construct a fence along the channel which "shall comply with the letter report from Higgins and Associates [*sic*] dated March 10, 2003."

City's responses to comments about the bridge make it clear that it was a future infrastructure improvement and not a required mitigation measure for the Supercenter. Furthermore, the Wal-Mart EIR was not defective for failing to explain how elimination of the bridge was consistent with the Rincon Plaza EIR because the Rincon Plaza EIR did not require the building of the bridge in connection with retail development in the area. Finally, the mitigation measures discussed *ante* were adequate.

## SIXTH STREET TRAFFIC

Next, Citizens assert the Wal-Mart EIR failed to analyze Sixth Street traffic although the Wal-Mart EIR anticipated "a tremendous volume of traffic on Sixth Street . . . [and r]esidents of Sixth Street expressed concern about Project traffic on Sixth Street near Elliott School on the west side of the Freeway once the Ronan Channel Bridge was completed." Citizens assert the EIR "piecemealed" analysis of Sixth Street traffic by separating analysis of the Sixth Street traffic impacts from the remainder of the project.

The Higgins 2003 traffic impact study report analyzed the Camino Arroyo/Gilman Road/Sixth Street intersection traffic conditions under existing, background, background plus project, cumulative, and general plan build-out conditions.

Under existing, background, and background plus project conditions, level of service (LOS)[20] results indicated that the intersection would operate "at a LOS A during the AM, PM, and weekend peak hours" and that no mitigation measures were required. Under cumulative conditions, the intersection "would operate at LOS B during the AM and LOS F during the PM and weekend peak hours." Under general plan build-out conditions, the intersection "would operate at LOS F during the PM and weekend peak hours." These cumulative and general plan build-out traffic conditions would be mitigated to less than significant levels with the mitigation measures that were adopted as project requirements.

Higgins's analysis was incorporated and discussed in the Wal-Mart EIR. The study concluded that the intersection operated at levels of service that required no mitigation measures or that impacts would be mitigated to less than significant levels with the mitigation measures that were adopted as project requirements.

This was an adequate identification and analysis of impacts on Sixth Street traffic that would be affected by the project with and without the Ronan Channel Bridge. The accusation of "piecemealing" is unfounded.

---

[20] "LOS is a qualitative description of an intersection and roadway's operation. [LOS] A represents free-flowing un-congested traffic conditions. [LOS] F represents highly congested traffic conditions with unacceptable delay to vehicles at the intersections and on the road segments. The intermediate levels of service represent incremental levels of congestion and delay between these two extremes."

## DISPOSITION

The judgment is affirmed.

Elia, J., and Bamattre-Manoukian, J., concurred.