Filed 4/18/23; Certified for Publication 5/10/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PRESERVATION ACTION COUNCIL OF SAN JOSE,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>CITY OF SAN JOSE et al.,<br><br>  Defendants and Respondents;<br><br>SJ CITYVIEW, LLC,<br><br>  Real Party in Interest and Respondent. | H049555<br>(Santa Clara County<br> Super. Ct. No. 20CV370195) |

Appellant Preservation Action Council of San Jose (PAC*SJ[1]) appeals from a trial court judgment denying its mandate petition. The petition challenges the City of San Jose's certification of a final supplemental environmental impact report (Final SEIR) for the proposed development of three, high-rise office towers as part of the City View Plaza Office Project (the project). The project sits on an eight-acre site containing several historic structures in downtown San Jose. Shortly after the trial court denied PAC*SJ's mandate petition, respondent and real party in interest City View, LLC (City View)

---

[1] We refer to appellant by the acronym used by the parties.

demolished the building known as the Bank of California, one of the historic structures on the project site.

In this appeal, PAC*SJ contends the Final SEIR was inadequate for failing to study and impose "compensatory mitigation" under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.;[2] CEQA) for the project's undisputed, significant impacts on historic resources. For the reasons explained below, we affirm the trial court's order and judgment denying a writ of mandate.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. *The Project and Project Site*

The project is located on an approximately eight-acre site at City View Plaza (originally Park Center Plaza) in downtown San Jose. Constructed between 1968 and 1985, the former Park Center Plaza was one of San Jose's first redevelopment sites. It contained the Bank of California (also known as the Sumitomo Bank Building) (Bank), which was built in 1971 as a bank and which later housed the Santa Clara County Family Court.

As part of the project's review process, the City of San Jose (City or San Jose) identified City View Plaza, in its entirety, and four of its individual buildings—including the Bank—as candidate city landmarks. The Bank also was identified as eligible for listing on the California Register of Historic Resources and National Register of Historic Places. City View Plaza itself consisted of nine buildings, comprising occupied office and commercial/retail use, over a single-level underground parking garage.

In April 2019, City View applied for a site development permit for the project. The site development permit provided that the project would require the demolition of all

---

[2] Unspecified statutory references are to CEQA provisions as codified in the Public Resources Code. Where applicable, the CEQA guidelines (Cal. Code Regs., tit. 14, §§ 15000–15387) will be noted as "Guidelines" to distinguish between the Public Resources Code and the Code of Regulations.

2

structures at City View Plaza, including those identified as historic resources, followed by the construction of three, 19-story office towers with approximately 3.5 million square feet of office space, 65,000 square feet of ground floor retail, and five levels of underground parking. The project design also included "habitable, multi-level bridges" connecting the three office towers, pedestrian pathways, outdoor seating areas, and "robust landscaping" to enhance the pedestrian experience.

### B. The City's Environmental Review and Approval of the Project

In December 2018, the City, through its city council (city council), certified the Downtown Strategy 2040 final environmental impact report. This report synchronized San Jose's strategic planning goals for the downtown area. In connection with these plans, the City determined that the project at City View Plaza required a supplemental environmental impact report (SEIR), tiered from the Downtown Strategy 2040 final environmental impact report, to evaluate project-specific impacts that had not been addressed.

During the scoping process for the draft SEIR, the Bank was identified as a candidate city landmark, and the project was referred to the Historic Landmarks Commission (Commission). The Commission serves as an advisory body to the City's planning director, planning commission, city council, and city manager on the designation, acquisition, and preservation of historic landmarks and property of historic value. The Commission held public hearings, as did the planning commission and city council, and ultimately determined that the Bank met the criteria for designation as a city landmark. On March 20, 2020, PAC*SJ formally nominated the Bank for consideration as a city landmark.

The nomination of the Bank for consideration as a city landmark occurred during the circulation period of the draft SEIR. The City, as the lead agency under CEQA, prepared the draft SEIR for the project. In anticipation of the Bank's eventual consideration as a city landmark, the draft SEIR analyzed the Bank as a candidate for city

3

landmark status and as an historic resource eligible for listing on the National and California registers.

The draft SEIR identified significant impacts of the project and proposed mitigation measures, set forth in a mitigation monitoring and reporting program. Regarding the impact on cultural resources, the draft SEIR identified the proposed demolition of the buildings at City View Plaza (including four buildings of historic value) as a "significant unavoidable impact" and presented mitigation measures. (Boldface & capitalization omitted.) The draft SEIR based the cultural resources information and mitigation on a historic resource project assessment conducted in December 2019 and updated in February 2020.

The mitigation measures (hereafter, MM CUL-1.1) described a series of actions, prior to the issuance of demolition permits, to document the structures in accordance with established guidelines, to advertise the availability of the structures for relocation, to otherwise make the structures available for salvage, and to employ measures (using physical remnants, oral histories, photographs, displays, and an historic marker) for commemoration of the four structures and the Park Center Plaza "as a whole." The draft SEIR also evaluated 11 alternatives to the project, including six historic preservation alternatives, which would have entailed preserving different combinations of the historic buildings on site, and a no project alternative. Of the six historic preservation alternatives, Preservation Alternative 6 (Alternative 6) would have preserved only the Bank building, at a loss of approximately 605,958 to 1,211,916 square feet of office space to the proposed project. The draft SEIR concluded that Alternative 6 "generally meets the project objectives but to a lesser degree than the proposed project."

The City published the draft SEIR in March 2020 and circulated it to the public for review and comment for a 45-day period from March 11, 2020, through April 24, 2020. The City received comments from several stakeholders, including the National Trust for Historic Preservation and California Preservation Foundation (Comment F), and PAC*SJ

4

(Comment G). These comments raised concerns about the demolition of the Bank and other historic buildings, and the adequacy of the City's alternatives analysis and proposed mitigation measures.

Comment F characterized as inadequate the proposed mitigation for the loss of the Bank, which it described as "a rare, early work of master architect César Pelli" and an "icon of Modernism." Comment F stated that so-called " 'document-and-destroy' mitigation cannot reduce impacts to a level of insignificance" under CEQA. It asserted the record in the draft SEIR did not contain substantial evidence to justify rejecting Alternative 6 and failed to discuss how preserving historic buildings on the site would render the project infeasible. Comment F further argued the project was inconsistent with policy goals set forth in San Jose's Downtown Strategy 2040 and General Plan to " '[p]reserve candidate or designated landmark buildings . . . with first priority given to preserving and rehabilitating them for their historic use, second to preserving and rehabilitating them for a new use, or third to rehabilitate and relocation [sic] on-site.' " (Italics & boldface omitted.)

Comment G similarly expressed concerns about the alternatives analysis and provided detailed comments on several preservation alternatives. Regarding mitigation, Comment G urged that "[g]iven the magnitude of potential loss to historic resources" at the City View Plaza site, "any project approvals must be accompanied by an extremely robust Historic Resources Mitigation Action Plan that takes the full spectrum and volume of impacted resources into account." Comment G made mitigation recommendations, including on-site preservation of the Bank (which PAC*SJ argued was "demonstrably feasible and would help mitigate the loss of the remainder of the site's historic resources"), financial support for broader efforts to survey and recognize this architectural period in San Jose, including post-World War II bank structures in particular, an expanded scope of any proposed documentation, commemoration, and

5

programming related to the candidate city landmarks, and financial support for preservation of adjacent historic resources.

The City responded to the comments and made minor revisions to the text in a first amendment to the draft SEIR in May 2020. Together, the first amendment and draft SEIR constitute the Final SEIR for the project.

On May 27, 2020, the city planning commission recommended that the city council certify the Final SEIR, make findings concerning project impacts, adopt a statement of overriding considerations and mitigation monitoring program, and approve the project. On June 3, 2020, the Commission recommended that the city council designate the Bank as a city landmark.

On June 16, 2020, after a lengthy public hearing in which the city council heard public comment on both the project and city landmark designation, the city council voted unanimously (in separate votes) not to designate the Bank as a city landmark and to approve the site development permit for the project. The city council adopted resolutions approving the site development permit and certifying the Final SEIR.

In the resolution certifying the Final SEIR, the city council made findings under CEQA concerning the project's significant environmental impacts, including the impact of the demolition of the historic plaza buildings on the city's cultural and historic resources, and mitigation measures discussed in the Final SEIR. The city council found that MM CUL-1.1, which focused on documentation and commemoration of the historic buildings, "would help to retain the memory of the buildings and their association with the City's history, but the impact would remain significant and unavoidable." The city council rejected the project alternatives analyzed in the draft SEIR as infeasible. It further adopted a statement of overriding considerations determining that the "anticipated economic, social, and other benefits" of the project outweighed its "significant and unavoidable impacts."

6

*C. Trial Court Proceedings*

In September 2020, PAC\*SJ filed this CEQA action. The petition for writ of mandamus (petition) asserts a single cause of action for CEQA violations, alleging deficiencies in the City and city council's Final SEIR certification and project approval, including "insufficient analysis of significant project impacts, mitigations, and alternatives," "failure to adequately respond to comments on the [SEIR]," "failure to adopt findings supported by substantial evidence in the whole of the record," and "failure to identify, study, or adopt identified project mitigation measures and alternatives that could reduce or avoid various identified environmental impacts." The petition states that approval of the project "would needlessly demolish significant historic resources . . ., despite the feasibility of mitigation measures and viable project alternatives to accomplish fundamental project objectives" and notes that "[o]f particular concern is the proposed razing of the brutalist 1973 Bank of California Building . . ., which the City recognizes as an 'exceptional' building designed by 'internationally renowned architect César Pelli.' "

In its opening brief in support of its petition, PAC\*SJ challenged the City's consideration of alternatives to demolition of the historic buildings at the project site. It argued that the record showed the City failed to engage in a meaningful analysis of alternatives, particularly of Alternative 6, to preserve the Bank and instead simply adopted the project as defined in extensive behind-the-scenes project planning between City View and the City. PAC\*SJ cited *Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336 (*Preservation Action*) as support for its argument that the City failed to comply with CEQA's mandate to independently analyze the purported infeasibility of the alternative and adopt feasible mitigation. PAC\*SJ also asserted that the City failed to adequately respond to comments and failed to justify its rejection of suggested mitigation measures, including deferral of demolition and "compensatory" payments to support preservation of other buildings in the City.

7

The City, city council, and real party in interest City View (collectively, respondents) filed a joint opposition brief, arguing that the Final SEIR adequately analyzed project alternatives and that the City's findings were supported by substantial evidence in the administrative record. Respondents also asserted that PAC*SJ's allegations regarding the City's inadequate response to comments and the question of compensatory mitigation were barred due to PAC*SJ having failed to make those arguments during the administrative proceedings.

PAC*SJ filed a reply brief in support of its petition, and the parties stipulated to a briefing and hearing schedule. On July 12, 2021, the trial court held a hearing on the petition, took the matter under submission, and later issued a tentative order denying the petition. Each side submitted supplemental briefing responding to the tentative order. On November 1, 2021, the trial court denied the petition in a final, written order and judgment. PAC*SJ timely appealed the denial of the petition.

*D. Demolition of the Bank*

Demolition of the Bank followed immediately after issuance of the trial court's judgment denying the petition for writ of mandate. PAC*SJ maintains that the demolition of the Bank, though "not judicially enjoined," was "unexpected." PAC*SJ suggests that the Bank's demolition moots any consideration of project alternatives and restricts this court's jurisdiction (and available remedies) to the only CEQA violation that remains justiciable. PAC*SJ identifies that violation as certification of the Final SEIR despite an inadequate analysis and identification of mitigation for the project's destruction of historic resources. Respondents dispute PAC*SJ's characterization of the decision to proceed with demolition but do not otherwise contradict PAC*SJ's articulation of the scope of issues justiciable on appeal.

## II. DISCUSSION

This appeal turns on the concept of "compensatory mitigation." PAC*SJ contends the Final SEIR is defective for 1) failing to identify, analyze, and impose compensatory

8

mitigation for the project's significant impacts to historic resources, and 2) failing to adequately respond to comments requesting compensatory mitigation. Respondents dispute the inadequacy of either element of the Final SEIR and, moreover, maintain that both claims are barred by the doctrine of administrative exhaustion. Because the parties also dispute the appropriate standard of deference applicable to our review, we begin by discussing the relevant legal principles and standard of judicial review.

### A. Legal Principles and Standard of Review

The fundamental "purpose of an EIR is to 'provide public agencies and the public in general with detailed information about the effect [that] a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' (§ 21061; see Guidelines, § 15003, subds. (b)–(e).)" (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511–512 (*Sierra Club*).) "By making this information available to decision makers and the public at a crucial moment when the merits of a project and its alternatives are under discussion, an EIR advances not only the goal of environmental protection but of informed self-government." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 383 (*California Building*).) It is "intended 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 (*Laurel Heights*).)

"The core of an EIR is the mitigation and alternatives sections." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 (*Citizens of Goleta*).) An EIR "must include a meaningful discussion of both project alternatives *and* mitigation measures." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 403.) An agency's evaluation of both the nature and scope of mitigation and alternatives is "guided by the doctrine of 'feasibility.' " (*Citizens of Goleta*, at p. 565.) The CEQA statute defines " '[f]easible' " as "capable of being accomplished in a successful manner within a reasonable period of

9

time, taking into account economic, environmental, social, and technological factors." (§ 21061.1; Guidelines, § 15364.)

Pursuant to CEQA's substantive mandate, an agency should not approve a proposed project if feasible alternatives or feasible mitigation measures exist which would substantially lessen the proposed project's significant environmental effects. (*Citizens of Goleta*, *supra*, 52 Cal.3d at p. 565; see § 21002; *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 996 [discussing CEQA's " 'substantive mandate' "].) On the other hand, "when 'economic, social, or other conditions' make alternatives and mitigation measures 'infeasible,' a project may be approved despite its significant environmental effects if the lead agency adopts a statement of overriding considerations and finds the benefits of the project outweigh the potential environmental damage." (*California Building*, *supra*, 62 Cal.4th at p. 383, citing §§ 21002, 21002.1, subd. (c); Guidelines, § 15093.) It is ultimately the agency's independent responsibility to provide an adequate discussion in the EIR of feasible mitigation and alternatives. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 405; *Preservation Action Council*, *supra*, 141 Cal.App.4th at pp. 1351–1352; see Guidelines, § 15126.4, subd. (b)(2).)

In evaluating the adequacy of an EIR, the appellate court reviews the agency's action, not the trial court's decision. (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495 (*Protecting Our Water*); *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 (*Vineyard*).) "The standard of review in a CEQA case, as provided in sections 21168.5 and 21005, is abuse of discretion." (*Sierra Club*, *supra*, 6 Cal.5th at p. 512.) "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.)

10

Our Supreme Court has reiterated on multiple occasions that judicial review for these two types of error (failing to proceed in the manner CEQA provides; and/or reaching factual conclusions unsupported by substantial evidence) "differs significantly: while we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions." (*Vineyard*, *supra*, 40 Cal.4th at p. 435.) These differences require the "reviewing court [to] adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Ibid.*; accord *Sierra Club*, *supra*, 6 Cal.5th at p. 512 [recognizing "a procedural issues/factual issues dichotomy" with respect to the CEQA standard of review].) Consistent with the differentiated standards stated above, we independently review the administrative record for " 'any legal error' by the agency and deferentially consider[] whether the record 'contains substantial evidence to support [the agency's] factual determinations.' " (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 495; see *Sierra Club*, at p. 512.)

In some cases, however, the distinction between de novo and substantial evidence review "is not always so clear." (*Sierra Club*, *supra*, 6 Cal.5th at p. 513.) The Supreme Court acknowledged this difficulty in *Sierra Club*. It explained that while "there are instances where the agency's discussion of significant project impacts may implicate a factual question that makes substantial evidence review appropriate" (*id*. at p. 514), courts "have consistently recognized that adequacy of discussion claims are not typically amenable to substantial evidence review." (*Id*. at p. 515.) That is, "[t]he determination whether a discussion is sufficient is not solely a matter of discerning whether there is substantial evidence to support the agency's factual conclusions." (*Id*. at p. 516.) Rather, "[t]he ultimate inquiry . . . is whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the

11

issues raised by the proposed project.' " (*Ibid.*)  That inquiry, which presents a mixed question of law and fact, "is generally subject to independent review."  (*Ibid.*)

In this case, the parties disagree about the degree of deference properly afforded to the agency (here, the City)'s certification of the Final SEIR.  PAC*SJ argues that, under *Vineyard* and *Sierra Club*, whether the City adequately addressed the issue of compensatory mitigation for the loss of historic buildings in the Final SEIR is subject to de novo review.  We agree.  Due to the demolition of the Bank following the trial court's judgment denying PAC*SJ's petition, the questions raised on appeal do not depend on underlying factual determinations (i.e., the feasibility of proposed project alternatives).  More specifically, whether the Final SEIR adequately identifies and analyzes feasible mitigation measures for the loss of cultural resources "is not solely a matter of discerning whether there is substantial evidence to support the agency's factual conclusions."  (*Sierra Club*, *supra*, 6 Cal.5th at p. 516.)  Instead, the sufficiency of that part of the agency's report is "a mixed question requir[ing] a determination whether statutory criteria were satisfied."  (*Ibid.*)  De novo review is therefore appropriate.  (*Ibid.*)

Respondents do not dispute the formulation of these standards but characterize PAC*SJ's challenge as based upon "the City's factual determination that PAC*SJ's compensatory mitigation was infeasible."  Respondents therefore maintain that "the City's decision remains subject to the normal substantial evidence standard, even under *Sierra Club*."  This argument overlooks the nature of PAC*SJ's claim, which is not based on any finding that compensatory mitigation is infeasible (a "finding" which appears nowhere in the record and is thus unavailable for substantial evidence review), but more broadly, on the insufficiency of the City's discussion underlying its rejection of the proposed compensatory mitigation.

What is more, we disagree with respondents' suggestion that the decision in *Sierra Club* merely reaffirmed well-settled principles of deference to factual determinations and held only "that whether an EIR 'omits' required information is a predominantly legal

12

question and subject to independent review." The *Sierra Club* decision did reaffirm that courts " 'accord greater deference to an agency's substantive factual conclusions.' " (*Sierra Club*, *supra*, 6 Cal.5th at p. 512.) But *Sierra Club* also explicitly addressed (and rejected) the argument made by the real party in interest in that case that de novo review applies only to circumstances in which an EIR omits required information. (*Id*. at p. 516.) It explained, "Real party in interest draws a distinction for standard of review purposes between claims that a required discussion has been omitted altogether and claims that a required discussion is insufficient, with the former subject to de novo review and the latter subject to substantial evidence review. But such a distinction is neither consistent with our precedent [citation] nor logically defensible. Whether or not the alleged inadequacy is the complete omission of a required discussion or a patently inadequate one-paragraph discussion devoid of analysis, the reviewing court must decide whether the EIR serves its purpose as an informational document." (*Ibid*.)

Consistent with the framework detailed in *Vineyard* and *Sierra Club*, we conclude that our review of the Final SEIR's discussion of mitigation measures is de novo insofar as it implicates a failure to proceed in the manner required by CEQA or limits informed decision-making by the agency or informed participation by the public. (*Sierra Club*, *supra*, 6 Cal.5th at p. 516; *Vineyard*, *supra*, 40 Cal.4th at p. 435; see *California Native*, *supra*, 177 Cal.App.4th at p. 987.) With that understanding, we turn to the merits of PAC*SJ's claims.[3]

---

[3] We need not resolve, for purposes of this appeal, the parties' additional disagreement concerning those appellate cases which, in reciting the standard of review, refer to a presumption of correctness when evaluating EIR approval, as it does not alter our independent review, under the standards articulated in *Sierra Club*, of the City's Final SEIR for compliance with CEQA.

13

*B. Compensatory Mitigation to Address Significant Impacts to Historic Resources*

This appeal requires us to assess the adequacy of the Final SEIR's discussion of mitigation for the unavoidable loss of significant historic resources.[4]  We conclude that this aspect of the Final SEIR complies with CEQA.

CEQA's purpose is to promote environmental protection and informed self-government.  (*California Building*, *supra*, 62 Cal.4th at p. 383.)  Historic resources are expressly included for protection.  (§§ 21001, subds. (b), (c); 21084.1; Guidelines, § 15064.5.)  The EIR process is central to this purpose.  The EIR must discuss, and the lead agency must consider and adopt, if feasible, alternatives to the project and mitigation measures which would "substantially lessen" the project's significant environmental effects.  (§ 21002; Guidelines, § 15126.4, subd. (a); *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 123 (*Mountain Lion*).)

CEQA's substantive mandate requires agencies to "refrain from approving projects for which there are feasible alternatives or mitigation measures" (*Mountain Lion*, *supra*, 16 Cal.4th at p. 134) unless, as occurred here, the agency makes specified findings and adopts a statement of overriding considerations (§ 21081).  (See *California Building*, *supra*, 62 Cal.4th at p. 383; §§ 21002, 21002.1; Guidelines, § 15093.)

CEQA's Guidelines define " '[m]itigation' " to include:  "Compensating for the impact by replacing or providing substitute resources or environments."  (Guidelines, § 15370, subd. (e).)  " 'Feasible' " means "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors."  (*Id*., § 15364.)  "Where several measures are available to mitigate an impact, each should be discussed and the basis for selecting a particular measure should be identified."  (*Id*., § 15126.4, subd. (a)(1)(B).)  Mitigation

---

**[4]** We are not persuaded by respondents' argument that PAC*SJ's claim is barred by the doctrine of administrative exhaustion and therefore address this issue on the merits.

measures also "must be consistent with all applicable constitutional requirements," including meeting "essential nexus" and " 'roughly proportional' " requirements under *Nollan*, *Dolan*, and *Ehrlich*.[5] (*Ibid*., subd. (a)(4).)

The City's draft SEIR included a detailed discussion of the history of the former Park Center Plaza as San Jose's first major redevelopment project, project impacts on the existing historic structures, and proposed mitigation. The draft SEIR recognized that the project would have a "significant unavoidable impact" on the historic plaza and presented mitigation measures. (Boldface & capitalization omitted.) Specifically, the draft SEIR noted that "[i]mplementation of the proposed project would result in the loss of multiple historic structures and the Park Center Plaza which are representative of modernist commercial architecture of the 1970s" and for which there were no other examples noted within the downtown, making the loss of nine of the 10 buildings within the plaza "cumulatively considerable." The draft SEIR proposed mitigation measures MM CUL-1.1. These entailed documenting the four historic structures prior to any disturbance of the project site, in accordance with specified guidelines (including drawings, photographs, and written documentation); documenting with digital scans and video production; advertising the availability of the structures for relocation; salvage; and commemoration by means such as building remnants, oral histories, maps, and displays.

In response to public comments on the draft SEIR raising concerns about the proposed demolition of the Bank and other historic buildings, and citing the inadequacy of the proposed mitigation measures, the Final SEIR reiterates that the draft SEIR "correctly identifies the impact to historic structures to be significant and unavoidable after implementation of the identified mitigation." It notes that MM CUL-1.1 ensures "appropriate recordation of the buildings on-site and the Candidate City Landmark District" and also provides for relocation, salvage, and commemoration. The Final SEIR

---

[5] *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825; *Dolan v. City of Tigard* (1994) 512 U.S. 374; *Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854.

15

acknowledges the requirement for proportionality between an impact and mitigation (Guidelines, § 15126.4, subd. (a)(4)(B)) but states there is "no evidence provided to suggest that complete documentation as outlined in the mitigation is not proportional. Requiring any one project to support Citywide or downtown survey efforts is not [] proportional and there is no nexus for the City to require it. Furthermore, the City cannot require a project to provide financial contributions to support preservation of other buildings within the City." The Final SEIR does not otherwise address further mitigation measures with respect to the project's impact on historical resources.

In approving the project, the city council found MM CUL-1.1 "would help to retain the memory of the buildings and their association with the city's history, but the impact would remain significant and unavoidable." The city council's statement of overriding considerations further stated that the project "has eliminated or substantially lessened all significant effects on the environment where feasible, and finds that the remaining significant unavoidable impact of the project is acceptable in light of the economic and social considerations noted below. . . ."

PAC*SJ contends that, contrary to CEQA, the City adopted a statement of overriding considerations despite failing to analyze proposed compensatory mitigation or make findings regarding its feasibility. PAC*SJ argues that the Final SEIR erroneously failed to consider compensatory mitigation (Guidelines, §15370, subd. (e)), despite finding that the documentation and commemoration measures did not reduce the impact below significance and even though compensatory measures are "routinely applied" to projects involving a loss of historic resources—including through the establishment of preservation funds to provide grants to projects affecting historic resources, or for funding for historic surveys and context statements. Chatten-Brown, Carstens, & Minteer, LLP (Chatten-Brown), as amicus curiae for PAC*SJ, further asserts that, as a strategy already in use in California, compensatory mitigation is "eminently feasible" and

16

is used by lead agencies throughout the state to preserve historic resources and offset development and redevelopment project impacts.[6]

PAC*SJ acknowledges that there are apparently no reported cases that address compensatory mitigation in the context of historic resources. PAC*SJ nevertheless analogizes impacts to historic sites to other impacts under CEQA for which compensatory mitigation is well-established—such as in cases involving impacts to biological resources or agricultural land. PAC*SJ points to several such examples applying offsite, compensatory mitigation for the direct loss of a protected resource at a project site. (See, e.g., *Save the Hill Group v. City of Livermore* (2022) 76 Cal.App.5th 1092, 1116 (*Save the Hill*) [mitigation for permanent loss of sensitive species habitat by requiring an offsite, privately owned open space parcel to be placed under a permanent easement]; *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 274 (*Wild Santee*) [requiring developer to acquire 209.6 acres of offsite habitat "directly contributing to regional conservation efforts"] *id*. at pp. 279–280 [and consisting of specified habitats supportive of the affected endangered butterfly species]; *Masonite Corp. v. County of Mendocino* (2013) 218 Cal.App.4th 230, 237–238 (*Masonite*) [concluding the lead agency erred by failing to consider agricultural conservation easements as a potential mitigation measure for the direct loss of 45 acres of productive farmland].)

PAC*SJ contends that "[a]s with losses of wildlife habitat and agricultural lands, investment in measures or funds that would enhance and promote protection of similar types of environmental resources—reasonably proportional to the values of the project and what is destroyed—is feasible" and "fulfills CEQA's substantive mandate by

---

[6] In its amicus brief, Chatten-Brown provides examples of historic preservation funds in San Francisco and Los Angeles County, used for purposes including disbursement of grants for surveys, landmark and historic register nominations, restoration feasibility studies, and the development of design guidelines.

17

reducing significant environmental impacts." While this may be true as a general proposition, PAC*SJ has not shown on the record of this case that "replacing or providing substitute resources or environments" (Guidelines, § 15370, subd. (e)) would serve the contemplated purpose for mitigation under CEQA, namely, to "substantially lessen the significant environmental effects" of the project. (§ 21002.)

There appears to be no statutory basis to preclude compensatory mitigation, as a matter of law, from consideration when addressing impacts to historic resources. CEQA defines a "project that may cause a substantial adverse change in the significance of an historical resource" as "a project that may have a significant effect on the environment." (§ 21084.1.) The Guidelines define "historical resource" to include those eligible for listing in the California Register of Historical Resources (Guidelines, § 15064.5, subd. (a)(1)) and require a lead agency to "identify potentially feasible measures to mitigate significant adverse changes in the significance of an historical resource." ( *Ibid*., subd. (b)(4).) Mitigation, as previously noted, may generally include "[c]ompensating for the impact by replacing or providing substitute resources or environments." (*Id*., § 15370, subd. (e).)

Consequently, in identifying "potentially feasible measures to mitigate significant adverse changes in the significance of an historical resource" (Guidelines, § 15064.5, subd. (b)(4)), proposed measures that compensate the impact "by replacing or providing substitute resources or environments" (*id*., § 15370, subd. (e)) may not be automatically excluded from consideration. " 'If more than one mitigation measure is available, the EIR must discuss each and describe reasons for the measure or measures it selects.' " (*Friends of Kings River v. County of Fresno* (2014) 232 Cal.App.4th 105, 123–124 (*Friends of Kings*); see Guidelines, § 15126.4, subd. (a)(1)(B).)

The theoretical availability of compensatory mitigation, however, does not resolve whether the City here abused its discretion under CEQA (§ 21168.5) by rejecting the proposition of adding compensatory mitigation to the measures adopted in MM CUL-1.1.

18

The City gave two reasons for rejecting the additional mitigation measures proposed in Comment G. It stated that "requiring any one project to support Citywide or downtown survey efforts is not [] proportional and there is no nexus for the City to require it," and "the City cannot require a project to provide financial contributions to support preservation of other buildings within the City." The City determined that the proposed mitigation exceeds the scope of what the City can reasonably require toward mitigation and fails to satisfy the proportionality and nexus predicates (Guidelines, § 15126.4, subd. (a)(4)(B)).

In the absence of any evidence in the record to suggest the existence of comparable historic resources in the downtown area, such as might feasibly serve as "substitute resources or environments" (Guidelines, § 15370, subd. (e)) for the anticipated loss of the Bank and historic plaza, we conclude that the City's determination was neither erroneous nor inconsistent with CEQA's substantive mandate. Our assessment is necessarily informed by the nature of the impact for which mitigation is sought.

As noted *ante*, following a detailed account of each structure's architectural and historic significance, the draft SEIR made findings regarding the project's "cumulative significant unavoidable impact" (boldface & capitalization omitted) on "significant cultural resources." The draft SEIR specifically found, "Implementation of the proposed project would result in the loss of multiple historic structures and the Park Center Plaza which are representative of modernist commercial architecture of the 1970s. A review of the City's Historic Resources Inventory does not show any specific buildings or group of buildings of the same architectural style, period of significance, and purpose within the downtown. Given that the project would demolish nine of the 10 buildings within this City block, the loss of these structures and the Park Center Plaza would be cumulatively considerable."

19

The draft SEIR's statement that no other building or group of buildings found in the downtown area shared similar architectural style or significance is a factual finding which PAC*SJ has not challenged and to which we defer. (*Vineyard*, *supra*, 40 Cal.4th at p. 435.) This finding reflects a broader fact—that the significant impact to historic resources in this case refers to the loss of those structures in the former Park Center Plaza which represented a specific architectural style and historical period in the City's economic development. According to the draft SEIR, the agency determined the plaza complex to be a historic resource under CEQA due to it, among other things, being the "first planned redevelopment project in Downtown San José," portraying "the environment of the local financial sector in an era of history . . . characterized by a distinctive corporate architectural style," embodying "distinguishing characteristics of the modern Brutalist architectural type that was prevalent . . . during the 1960s and early 1970s," representing the work of architects César Pelli and his team at Gruen Associates, and others "whose work has influenced the development of the city of San José," and because the architectural design, detail, and materials "represent[] a significant architectural innovation in the local area and remain[] unique in the large context of the local built environment."

In light of the draft SEIR findings concerning the unique historic value of the plaza and its structures for San Jose, and the apparent dearth of other structures in the downtown area sharing the "same architectural style, period of significance, and purpose," we decide the City did not abuse its discretion in rejecting, without more robust discussion and consideration, the proposed compensatory measures as mitigation for the loss of Park Center Plaza's historic resources.

"Historical places and structures are rarely, if ever, fungible items of equivalent historical significance and value." (*Make UC a Good Neighbor v. Regents of University of California* (2023) 88 Cal.App.5th 656, 681.) Nothing in the administrative record here suggests the existence of any structures of similar architectural and historic significance,

20

and PAC*SJ has offered no authority to support its argument that compensatory mitigation, broadly directed at historic preservation *generally* (such as by creating an historic preservation fund to identify and protect offsite historic resources), would serve as feasible mitigation in this context. On the contrary, mitigation "by replacing or providing substitute resources" (Guidelines, § 15370, subd. (e)) appears to be infeasible given the specific architectural and historic resources impacted here.

This circumstance, whereby the significant impact under CEQA is the loss of a unique, non-transferable element of the built environment, distinguishes this case from others which have required or upheld the application of compensatory mitigation. Typically, compensatory mitigation involves a significant impact to an ecological habitat, threatened or protected species, or farmland—resources for which a direct impact on the project site can potentially be mitigated by "providing substitute resources or environments" (Guidelines, § 15370, subd. (e)) with some measure of equivalence.

For example, in *Save the Hill*, the appellate court upheld a measure mitigating the permanent loss of up to 31.78 acres of habitat that supported a variety of special-status species protected under state and federal law by preserving, at a stated ratio, offsite habitat under a conservation easement. (*Save the Hill*, *supra*, 76 Cal.App.5th at pp. 1116–1117.) Notably, the land being placed under conservation easement was "suitable for mitigation" in that it "contain[ed] sensitive habitat that house[d] a variety of plant and animal species" (*id*. at p. 1116) and the "mitigation task" as directed at "identified animal species." (*Ibid*.)

So too, in *Masonite*, the draft EIR identified the loss of 45 acres of designated, prime farmland as a significant impact. (*Masonite*, *supra*, 218 Cal.App.4th at p. 235.) The appellate court held that the EIR should have addressed mitigation in the form of off-site acquisition of farmland under stewardship of an agricultural conservation easement, since "preserving substitute resources" in the form of an easement "compensate[s] for the loss of farmland within the Guidelines' definition of mitigation." (*Id*. at p. 238; but see

21

*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 875 [rejecting agricultural conservation easements as effective mitigation for project's conversion of 289 acres of farmland annually, since implementing easements "would not change the net effect"]; *id*. at p. 876 [resulting, at the end of each year, in "289 fewer acres of agricultural land in Kern County"].) In *Wild Santee*, the EIR required the developer to mitigate impacts to an endangered butterfly species and other biological communities by eventually acquiring 209.6 acres of offsite habitat consisting of those specified habitats supportive of the affected species. (*Wild Santee*, *supra*, 210 Cal.App.4th at p. 274.)

The demonstrated application of compensatory mitigation in these cases illustrates the possibilities, consistent with subdivision (e) of Guidelines section 15370, for substitution or replacement of the loss of a reasonably equivalent resource. However, there is no statutory or case authority for the proposition that an agency must expound on proposed compensatory mitigation in the absence of evidence that the measure has some potential to actually mitigate the identified impact.

"[P]ublic agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available *which would substantially lessen* the significant environmental effects of such projects." (§ 21002, italics added.) Thus, " ' " 'CEQA does not require analysis of every *imaginable* alternative or mitigation measure.' " ' " (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 935 (*Gilroy Citizens*); accord *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 244.) Rather, CEQA's substantive mandate requires an agency to consider only "measures that might mitigate a project's adverse environmental impact, and adopt them if feasible." (*Mountain Lion*, *supra*, 16 Cal.4th at p. 123.)

In sum, while the Guidelines specify compensatory mitigation as one of several, allowable forms of mitigation (Guidelines, § 15370), making it "an accepted part of

22

' "agencies" toolboxes as available mitigation" ' for environmental impacts" (*Save the Hill*, *supra*, 76 Cal.App.5th at p. 1117; see *Friends of Kings*, *supra*, 232 Cal.App.4th at pp. 124–126), there is no statutory or other basis to require detailed consideration of measures proposed to an agency, absent some evidence that the compensatory mitigation measure would substantially lessen the significant impact. Here, given the unchallenged findings in the draft SEIR concerning the uniqueness of the impacted historic resources, the Final SEIR's consideration of the proposed compensatory mitigation was legally adequate. We decide the City did not abuse its discretion by briefly considering and rejecting the additional mitigation measures set forth in Comment G.

### C. Response to Public Comment on Compensatory Mitigation

PAC*SJ also contends that the Final SEIR failed to adequately respond to public comments concerning compensatory mitigation. PAC*SJ argues that the City's response to Comment G in the Final EIR does not satisfy the level of detail and "good faith, reasoned analysis" required by the CEQA Guidelines. (Guidelines, § 15088, subd. (c).) Respondents counter that PAC*SJ failed to exhaust its administrative remedies on this issue, and in any event, the City's response to comments in the Final SEIR is legally adequate.

We begin with the issue of exhaustion. As a jurisdictional prerequisite to maintenance of a CEQA action, the rule of exhaustion serves " 'to provide an administrative agency with the opportunity to decide matters in its area of expertise prior to judicial review.' " (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 616 (*California Native Plant*).) The requirement " 'is satisfied if "the alleged grounds for noncompliance with [CEQA] were presented . . . by any person during the public comment period provided by [CEQA] or prior to the close of the public hearing on the project before the issuance of the notice of determination." ' " (*Ibid.*) While it takes something more than " 'generalized environmental comments at public hearings' " to exhaust administrative remedies, " 'less specificity is required to preserve

23

an issue for appeal in an administrative proceeding than in a judicial proceeding.' " (*Ibid.*; accord *Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 898.) At bottom, "CEQA does not require public interest groups . . . , to do more than fairly apprise the agency of their complaints in order to preserve them for appeal." (*Save the Hill*, *supra*, 76 Cal.App.5th at p. 1104.)

Respondents argue that PAC*SJ did not present the specific issue raised here at the administrative level, having failed to assert (prior to filing this petition) that the City's response to comments was inadequate. We disagree.

PAC*SJ's written comments in response to the draft SEIR apprised the City and city council that it believed the SEIR was legally inadequate on several grounds. Those grounds included that the proposed mitigation failed to address "the magnitude of potential loss to historic resources on this site" and did "not meet CEQA standards for 'rough proportionality,' " given the proposed "elimination of an entire Candidate City Landmark District and the loss of the majority of downtown San José's exemplary and representative examples of Urban Redevelopment-era commercial architecture." In Comment G, PAC*SJ suggested "an urgent need for additional survey efforts and context statements for both downtown San Jose and the City at large" and urged that appropriate mitigation would include an expanded scope of documentation, commemoration, and interpretive programming to include all of the candidate City Landmark District (not just the four candidate buildings), financial support for "additional survey efforts" to recognize the architectural period in San Jose, including in particular post-World War II bank structures, and financial support for preservation of adjacent historic resources including city landmarks and civic spaces.

On this record, we conclude that PAC*SJ's comments during the administrative proceedings were adequate, under the applicable standard, to inform the City of the basis for its claim regarding the alleged inadequacy of the draft SEIR's treatment of mitigation. (*California Native Plant*, *supra*, 172 Cal.App.4th at p. 616; *Save the Hill*, *supra*, 76

24

Cal.App.5th at p. 1104.)  Having decided that PAC*SJ's written comments sufficed to alert the City of its complaint, we decline to hold that PAC*SJ's subsequent failure to complain about the City's response to comments on the draft SEIR precludes it from raising the claim on appeal.

The question is whether the City was apprised of the alleged grounds for noncompliance with CEQA before the final administrative step and issuance of the notice of determination.  (*California Native Plant*, *supra*, 172 Cal.App.4th at p. 616; *Save the Hill*, *supra*, 76 Cal.App.5th at p. 1104.)  We independently review the administrative record and do not defer to the trial court's determination.  (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 495; *Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 873.)

The record reflects that PAC*SJ and other public interest organizations and members of the public spoke at public hearings after publication of the Final SEIR and before the city council's certifying vote, including regarding the project and the recommendation for historic landmark designation for the Bank.  However, there is no evidence that any of those comments raised the adequacy of the Final SEIR's response to earlier comment letters.  Respondents contend, as the trial court found, that PAC*SJ " 'had many genuine opportunities to raise the issue' " during the administrative process, such as at the May 2020 planning commission hearing and at the June 2020 city council meeting.  However, given the timing of issues brought before the city council at its June 2020 meeting, wherein it considered both the approval of the project and the recommended designation of the Bank as a city landmark, it is unsurprising that the focus of public input was the recommended designation of the Bank, and whether the SEIR had fairly considered alternatives to avoid its demolition.

" 'Consideration of whether [] exhaustion has occurred in a given case will depend upon the procedures applicable to the public agency in question.' "  (*Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81 Cal.App.4th 577, 591.)  This is not a

situation where PAC*SJ failed to "exhaust" further administrative remedies available to it (as in the case of an administrative appeals process), thereby depriving the public agency of the opportunity to respond to the objections and correct any errors before judicial intervention. (Cf. *id*. at pp. 592–593 [plaintiffs failed to exhaust administrative remedy where they failed to raise the issue before the court in an administrative appeal of the planning commission's decision to the county board of supervisors].) Indeed, PAC*SJ properly lodged its written objections to the draft SEIR and participated in subsequent public hearings in which the primary issues then before the city council were discussed. We decide that under these circumstances, PAC*SJ's failure to raise adequacy of the City's response to Comment G—when the issue of adequate mitigation was squarely raised in the public comments themselves—does not signify a failure to exhaust administrative remedies within the meaning and purpose of the doctrine. We turn to the City's response to the written comments.

The guiding standard for an agency's response to comments received on a draft EIR is that of a "good faith, reasoned analysis." (Guidelines, § 15088, subd. (c).) In particular, "[w]hen a comment raises a significant environmental issue, the lead agency must address the comment 'in detail giving reasons why' the comment was 'not accepted. There must be good faith, reasoned analysis in response. Conclusory statements unsupported by factual information will not suffice.' " (*The Flanders Foundation v. City of Carmel-by-the-Sea* (2012) 202 Cal.App.4th 603, 615, quoting Guidelines, § 15088, subd. (c); see also *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1124.) CEQA cases have consistently held that " ' "[t]he determination of the sufficiency of the agency's responses to comments on the draft EIR turns upon the detail required in the responses. [Citation.] Where a general comment is made, a general response is sufficient." ' " (*Gilroy Citizens*, *supra*, 140 Cal.App.4th at p. 937; see Guidelines, § 15088, subd. (c).) Furthermore, "[s]atisfactory

26

responses to comments ' "may be provided by reference to the EIR itself." ' " (*Gilroy Citizens*, at p. 937.)

Applying this standard, we conclude that the City's response to the relevant comments in the Final SEIR, though lacking in detail, was sufficient, particularly in view of the SEIR findings discussed *ante*.

As we previously summarized, Comment G stated that the measures described in the draft SEIR's MM CUL-1.1 were inadequate.  Comment G asserted that "any project approvals must be accompanied by an extremely robust Historic Resources Mitigation Action Plan that takes the full spectrum and volume of impacted resources into account." It made specific mitigation recommendations, which included in relevant part:  (1) to expand the scope of mitigation to "meet CEQA standards for 'rough proportionality' " (given the proposed elimination of an "entire Candidate City Landmark District and the loss of the majority of downtown San José's exemplary and representative examples of Urban Redevelopment-era commercial architecture") by providing financial support for "additional survey efforts and context statements for both downtown San Jose and the City at large"; (2) to provide financial support for "survey efforts addressing bank structures, particularly post-World War II banks, across San José"; (3) to expand the scope of proposed documentation, commemoration, and interpretive programming to "all contributing elements" of the candidate City Landmark District marked for demolition; and (4) to include financial contributions to support preservation of adjacent city landmarks and civic spaces.

In response, the Final SEIR primarily addresses the purpose of MM CUL-1.1, "to ensure appropriate recordation of the buildings on-site and the Candidate City Landmark District" as well as enable "relocation, salvage, and commemoration"—actions that "must be approved by the City's Historic Preservation Officer."  Regarding rough proportionality, the response to Comment G asserts "there is no evidence provided to suggest that complete documentation as outlined in the mitigation is not proportional."  It

27

further adds, "Requiring any one project to support Citywide or downtown survey efforts is not, however, proportional and there is no nexus for the City to require it. Furthermore, the City cannot require a project to provide financial contributions to support preservation of other buildings within the City."

The Final SEIR response to Comment G, without more, arguably lacks the requisite "reasoned analysis in response" (Guidelines, § 15088, subd. (c)) to the detailed comments concerning rough proportionality and financial support for expanded survey and historic preservation efforts. However, when considered in connection with the draft SEIR (*Gilroy Citizens*, *supra*, 140 Cal.App.4th at p. 937), the response is sufficient to explain the City's reasons for rejecting the additional mitigation measures.

The Final SEIR acknowledges that the demolition of the plaza and on-site historic structures will have a significant and unavoidable impact on the identified historic resources and correctly cites the agency's responsibility to identify all feasible mitigation measures. Regarding the scope of mitigation, the Final SEIR finds that "appropriate recordation" of the buildings and candidate City Landmark District as described in MM CUL-1.1, along with options for salvage and commemoration, provides "complete documentation" of the affected resources. As to the proposal to scale mitigation to further address the significant effects of the demolition, including by funding expanded downtown survey and preservation efforts for other historic structures and civic spaces in the downtown area, the City's response may be understood in reference to the findings cited above. Specifically, when viewed in connection with the draft EIR findings concerning the unique historic value of the candidate City Landmark buildings and candidate City Landmark District, for which there are no other comparable examples in the downtown area, the Final SEIR's conclusion that such mitigation is "not . . . proportional" and "there is no nexus for the City to require it" refers to the lack of relatedness between the proposed measures and the specific impact of the project.

28

This response adequately conveys the City's reasoning that general measures to promote historic preservation in the downtown area do not serve as compensatory mitigation for the loss of specific and unique architectural and historic resources. We therefore decide this response was sufficient to satisfy CEQA's guidelines and inform the relevant public agencies and the public of the City's determination.

## III.  DISPOSITION

The judgment denying the petition for writ of mandate is affirmed. Respondents are entitled to recover their reasonable costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

_____
Danner, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P.J.




_____
Wilson, J.

**H049555**
*Preservation Action Council of San Jose v. City of San Jose*

Filed 5/10/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PRESERVATION ACTION COUNCIL OF SAN JOSE, <br><br>     Plaintiff and Appellant, <br><br>     v. <br><br> CITY OF SAN JOSE et al., <br><br>     Defendants and Respondents; <br><br> SJ CITYVIEW, LLC, <br><br>     Real Party in Interest and Respondent. | H049555 <br> (Santa Clara County <br>  Super. Ct. No. 20CV370195) |

BY THE COURT:

The opinion in this case filed April 18, 2023, was not certified for publication. After the court's review of a request under California Rules of Court, rule 8.1120(a), and it appearing that the opinion meets the standards for publication under California Rules of Court, rule 8.1105, it is therefore ordered that the opinion be published in the Official Reports.

_____
Danner, J.

_____
Bamattre-Manoukian, Acting P.J.

_____
Wilson, J.

**H049555**
*Preservation Action Council of San Jose v. City of San Jose*

| Trial Court: | Santa Clara County Superior Court |
|---|---|
| Trial Judge: | Hon. Sunil R. Kulkarni |
| Counsel for Plaintiff and Appellant Preservation Action Counsel of San Jose: | Susan Brandt-Hawley<br>Brandt-Hawley Law Group |
| Counsel for Amicus Curiae: | Amy Minteer<br>Michelle N. Black<br>Chatten-Brown, Carstens & Minteer, LLP |
| Counsel for Defendant and Respondent City of San Jose: | Nora Frimann<br>Margo Laskowska<br>Office of the City Attorney |
| Counsel for Real Party in Interest and Respondent SJ Cityview, LLC: | Alexander L. Merritt<br>Kathryn Kafka<br>Sheppard, Mullin, Richter & Hampton, LLP |

**H049555**
*Preservation Action Council of San Jose v. City of San Jose*